**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, THE COMMONWEALTH OF MASSACHUSETTS, *ex rel.* [UNDER SEAL] <br><br> Plaintiffs, <br><br> v. <br><br> [UNDER SEAL] <br><br> Defendants. | **UNDER SEAL** <br><br> *Qui tam action filed in camera and under seal in accordance with 31 U.S.C. § 3730(b)(2)* <br><br> Civil Action No. _____ |

**COMPLAINT**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, THE COMMONWEALTH OF MASSACHUSETTS, *ex rel.* STEPHEN M. ZAPPALA, M.D., OLIVIA LANNA, M.D., and ERIC WOJCIK,<br><br>                              Plaintiffs,<br><br>                    v. | **UNDER SEAL**<br><br>*Qui tam action filed in camera and under seal in accordance with 31 U.S.C. § 3730(b)(2)* |
| STEWARD HEALTH CARE SYSTEM LLC, STEWARD ST. ELIZABETH'S MEDICAL CENTER OF BOSTON, INC., STEWARD HOLY FAMILY HOSPITAL, INC., STEWARD GOOD SAMARITAN MEDICAL CENTER, INC., STEWARD ST. ANNE'S HOSPITAL CORP., STEWARD NORWOOD HOSPITAL, INC., STEWARD CARNEY HOSPITAL, INC., NASHOBA VALLEY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC., MORTON HOSPITAL, A STEWARD FAMILY HOSPITAL, INC., QUINCY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC., NEW ENGLAND SINAI HOSPITAL, A STEWARD FAMILY HOSPITAL, INC., STEWARD GOOD SAMARITAN RADIATION ONCOLOGY CENTER, INC., STEWARD SEBASTIAN RIVER MEDICAL CENTER, INC., STEWARD ROCKLEDGE HOSPITAL, INC., STEWARD MELBOURNE HOSPITAL, INC., STEWARD TRUMBULL MEDICAL HOSPITAL, INC., STEWARD SHARON REGIONAL HEALTH SYSTEM, INC., STEWARD EASTON HOSPITAL, INC., STEWARD MEDICAL GROUP, INC., STEWARD HEALTH CARE NETWORK, INC., STEWARD INTEGRATED CARE NETWORK, INC., STEWARD NATIONAL CARE NETWORK, INC., STEWARD MEDICAID CARE NETWORK, INC., and CERBERUS CAPITAL MANAGEMENT, L.P.,<br>                              Defendants. | Civil Action No. _____ |

## COMPLAINT

1.      Plaintiff relators Stephen M. Zappala, M.D., Olivia Lanna, M.D., and Eric Wojcik (collectively, "Relators") bring this action on behalf of the United States of America and the Commonwealth of Massachusetts against Steward Health Care System LLC, Steward St. Elizabeth's Medical Center of Boston, Inc., Steward Holy Family Hospital, Inc., Steward Good Samaritan Medical Center, Inc., Steward St. Anne's Hospital Corp., Steward Norwood Hospital, Inc., Steward Carney Hospital, Inc., Nashoba Valley Medical Center, A Steward Family Hospital, Inc., Morton Hospital, A Steward Family Hospital, Inc., Quincy Medical Center, A Steward Family Hospital, Inc., New England Sinai Hospital, A Steward Family Hospital, Inc., Steward Good Samaritan Radiation Oncology Center, Inc., Steward Sebastian River Medical Center, Inc., Steward Rockledge Hospital, Inc., Steward Melbourne Hospital, Inc., Steward Trumbull Medical Hospital, Inc., Steward Sharon Regional Health System, Inc., Steward Easton Hospital, Inc., Steward Medical Group, Inc., Steward Health Care Network, Inc., Steward Integrated Care Network, Inc., Steward Medicaid Care Network, Inc., Steward National Care Network, Inc., (collectively, "Steward") and Cerberus Capital Management, L.P., ("Cerberus") (Steward and Cerberus are collectively referred to herein as "Defendants") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "Federal FCA"), the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "Federal AKS"), and the federal Stark Statute, 42 U.S.C. § 1395nn (the "Stark Statute"), as well as the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.* (the "Massachusetts FCA") and the Massachusetts Anti-Kickback Statute, Mass. Gen. Laws ch. 118E § 41 (the "Massachusetts AKS"), to recover all damages, civil penalties and all other recoveries provided for under these statutes.

1

# I. **INTRODUCTION**

2.      This False Claims Act case arises from the actions of the Steward Health Care System
and its related entities, which today form the largest privately-owned for-profit hospital network
in the United States. Steward was founded in 2010 when the private equity firm defendant
Cerberus acquired a group of nine non-profit Catholic hospitals in eastern Massachusetts and
converted them into a for-profit enterprise. Cerberus expanded Steward into western
Massachusetts and then into numerous other states. Steward provides health care services to
Medicare and Medicaid (and private pay) patients. It showcases its highly integrated operations,
and a cornerstone of this integrated business model is its Accountable Care Organizations
("ACOs"). These ACOs bring together large groups of physicians, hospitals, and other providers
that apply for ACO status with CMS. ACOs are financially rewarded for adhering to CMS's
participation and payment requirements, achieving a given level of efficiency, coordination, and
successful patient care, as measured by various government enumerated metrics.

3.      Defendants Steward and Cerberus have wholly corrupted that ACO model, however.
Under the guise of utilizing it to deliver high quality health care efficiently, Defendants have
instead exploited the ACOs to choose profits over patient care. In the course thereof, they are
presenting false claims, and causing false claims to be submitted, to the government in several
ways: (1) using financial penalties, psychological pressure, and the threat of termination on
doctors, they have trapped Medicare and Medicaid patients within the Steward system,
unlawfully preventing them and their physicians from choosing the specialist or the hospital that
they believe is best; (2) they have used kickbacks and self-referrals to taint physician decisions
and keep patients in-network; (3) they have over prescribed and under managed patients on
opioids and other controlled substances; (4) they have caused physicians to engage in a pervasive

2

pattern of failing to administer adequate patient care in order to lower costs;(5) they have

falsified or caused to be falsified clinical data within patient files; (6) they have provided, or

caused to be provided, information utilized to determine how much the ACOs will be reimbursed

that is materially false and misleading; and (7) by virtue of trapping patients, violating the

Federal AKS, the Massachusetts AKS, and the Stark Statute, and engaging in the other unlawful

activities alleged herein, they have violated the requirements of the ACOs, which, had that fact

been known, would have led to the ACOs' termination.

## II.  JURISDICTION & VENUE

4.      Jurisdiction is founded upon the Federal FCA, 31 U.S.C. §§ 3729 *et seq.*, specifically 31

U.S.C. §§ 3732(a) & (b), and also 28 U.S.C. §§ 1331 & 1345. The Court may exercise personal

jurisdiction over Steward and Cerberus Capital Management, L.P., because they transact

business in this District and are engaging in the alleged illegal activities and practices in this

District.

5.      Venue in this District is appropriate under 31 U.S.C. § 3732(a), in that many of the acts

complained of took place in the District.

## III.  PARTIES

6.      The United States is a real party in interest to the claims of this action. The United States

administers the Medicare and Medicaid programs through the Department of Health and Human

Services ("HHS") and Centers for Medicare & Medicaid Services ("CMS").

7.      The Commonwealth of Massachusetts is a real party in interest to the claims of this

action. The Commonwealth brings this action on behalf of its Medicaid program, MassHealth, as

well as its agencies and state interests.

8.      Plaintiff relator Stephen M. Zappala, M.D., is a physician specializing in Urology who practices and resides in Massachusetts. Dr. Zappala is an internationally renowned urologist with over 30 years of experience and the president of and sole physician at Andover Urology. He is a Board-Certified Diplomat of the American Board of Urology specializing in both pediatric and adult urologic surgery and is an Assistant Clinical Professor of Urology at Tufts University School of Medicine. Dr. Zappala has held privileges at numerous hospitals and outpatient surgical facilities located in Massachusetts, including, among others, Steward's Holy Family Hospital, Lahey Clinic, Parkland HCA Hospital, Salem Surgery Center, and Orchard Surgical Center. Dr. Zappala did not join Steward Medical Group (defined below) and maintained his individual medical practice at all times relevant herein. Dr. Zappala brings this action on behalf of the United States and the Commonwealth of Massachusetts. The allegations in this complaint are based in part upon information and knowledge that Dr. Zappala obtained first hand in the course of treating patients who received care from providers employed by or affiliated with Steward.

9.      Plaintiff relator Olivia Lanna, M.D., is a board-certified physician specializing in internal medicine who practices and resides in Massachusetts. Dr. Lanna practiced medicine as an employee of defendant Steward Medical Group, Inc., from May 31, 2014 (contract signed February 27, 2014) until she resigned on November 6, 2015. During her tenure at Steward Medical Group, Dr. Lanna treated patients in the office and admitted them to various Steward hospitals including St. Elizabeth's Medical Center and Carney Hospital. She has also practiced medicine at Tufts Medical Center (Boston, Massachusetts), Newport Hospital (Newport, Rhode Island), Landmark Medical Center (Woonsocket, Rhode Island), and UMass Memorial Medical Center (Worcester, Massachusetts). In addition, she has practiced at Rhode Island Hospital

4

where she served for four years on the admissions committee. She also served on the Board of

the Rhode Island Medical Women's Association for four years, currently serves on the American

College of Physicians Chapter Health and Policy Committee, and is an active member of the

Massachusetts Medical Society. Dr. Lanna brings this action on behalf of the United States and

the Commonwealth of Massachusetts. The allegations in this complaint are based in part upon

information and knowledge that Dr. Lanna obtained first hand in the course of her employment

by Steward Medical Group and treating patients who received care from providers employed by

or affiliated with Steward.

10.     Plaintiff relator Eric Wojcik is a health care professional who resides in Massachusetts.

From 2007 to 2016, Mr. Wojcik was the Director of Oncology Services & Community Outreach

Coordinator for Steward's Good Samaritan Medical Center, having been promoted from the

position of Cancer Program Coordinator. In that position, Mr. Wojcik supervised Good

Samaritan Medical Center's cancer treatment program. In 2016, Good Samaritan Medical Center

ended Mr. Wojcik's employment ostensibly as part of a cost reduction strategy. Mr. Wojcik is

currently employed as a cancer registrar at Metrowest Medical Center in Framingham,

Massachusetts. Prior to joining Good Samaritan Medical Center, he worked as a cancer registrar

at Rhode Island Hospital in Providence, Rhode Island, for approximately two years. Mr. Wojcik

brings this action on behalf of the United States and the Commonwealth of Massachusetts. The

allegations in this complaint are based in part upon information and knowledge that Mr. Wojcik

obtained first hand while he worked at Good Samaritan Medical Center.

11.     Defendant Steward Health Care System LLC ("SHCS"), a for-profit Delaware limited

liability company, owns or is otherwise affiliated with and controls and operates, among other

entities, Steward Medical Holdings LLC ("SMH"), a Delaware limited liability company,

Steward Hospital Holdings LLC ("SHH"), a Delaware limited liability company, Steward Medicaid Care Network, Inc. ("SMCN"), Steward Integrated Care Network, Inc. ("SICN"), Steward Medical Group, Inc., Steward Health Care Network, Inc., Steward Medical Care Network, Inc., Steward Hospital Management Company, and Steward Operations Holdings LLC ("SOH") that together form a broad health care system in Massachusetts. SHCS also owns or is otherwise affiliated with and controls and operates multiple hospitals and health care provider entities, including the hospitals named as defendants herein. SHCS maintains its corporate headquarters in Dallas, Texas. Prior to approximately August 28, 2018, it maintained its corporate headquarters at 111 Huntington Ave., Suite 1800, Boston, Massachusetts. SHCS is owned and controlled by Cerberus Capital Management, L.P., and/or affiliates of the private investment firm. In a complaint filed against Blue Cross & Blue Shield of Rhode Island in 2013, SHCS describes itself as "an integrated health care delivery system and accountable care organization."

12.    Defendant Steward St. Elizabeth's Medical Center of Boston, Inc., a Delaware corporation, owns and operates St. Elizabeth's Medical Center located in Brighton, Massachusetts. St. Elizabeth's Medical Center of Boston, Inc., is a subsidiary of SHH and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

13.    Defendant Steward Holy Family Hospital, Inc., a Delaware corporation, owns and operates the Holy Family Hospitals located in Methuen and Haverhill, Massachusetts (Holy Family Hospital - Haverhill was formerly known as the Hale Hospital and subsequently Merrimack Valley Hospital). Steward Holy Family Hospital, Inc., is a subsidiary of SHH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

6

14.     Defendant Steward Good Samaritan Medical Center, Inc., a Delaware corporation, owns and operates Good Samaritan Medical Center located in Brockton, Massachusetts. Good Samaritan Medical Center, Inc., is a subsidiary of SHH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

15.     Defendant Steward St. Anne's Hospital Corporation, a Delaware corporation, owns and operates St. Anne's Hospital located in Fall River, Massachusetts. St. Anne's Hospital Corporation is a subsidiary of SHH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

16.     Defendant Steward Norwood Hospital, Inc., a Delaware corporation, owns and operates Norwood Hospital located in Norwood, Massachusetts. Steward Norwood Hospital, Inc., is a subsidiary of SHH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

17.     Defendant Steward Carney Hospital, Inc., a Delaware corporation, owns and operates Carney Hospital located in Dorchester, Massachusetts. Steward Carney Hospital, Inc., is a subsidiary of SHH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

18.     Defendant Nashoba Valley Medical Center, A Steward Family Hospital, Inc., a Delaware corporation, owns and operates Nashoba Valley Medical Center located in Ayer, Massachusetts. Nashoba Valley Medical Center, A Steward Family Hospital, Inc., is a subsidiary of SMH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

19.     Defendant Morton Hospital, A Steward Family Hospital, Inc., a Delaware corporation, owns and operates Morton Hospital located in Taunton, Massachusetts. Morton Hospital, A

Steward Family Hospital, Inc., is a subsidiary of SMH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

20.     Defendant Quincy Medical Center, A Steward Family Hospital, Inc., a Delaware corporation, owns and operates Quincy Medical Center in Quincy, Massachusetts. Quincy Medical Center, A Steward Family Hospital, Inc., is a subsidiary of SMH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

21.     Defendant New England Sinai Hospital, A Steward Family Hospital, Inc., a Delaware corporation, owns and operates New England Sinai Hospital located in Stoughton, Massachusetts. New England Sinai Hospital, A Steward Family Hospital, Inc., is a subsidiary of SMH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

22.     Defendant Steward Good Samaritan Radiation Oncology Center, Inc., a Delaware corporation, owns and operates the Good Samaritan Radiation Oncology Center at the Good Samaritan Medical Center located in Brockton, Massachusetts. Good Samaritan Radiation Oncology Center, Inc., is a subsidiary of SOH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

23.     Defendant Steward Sebastian River Medical Center, Inc., a Delaware corporation, owns and operates Sebastian River Medical Center located in Sebastian, Florida. Steward Sebastian River Medical Center, Inc., is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

24.     Defendant Steward Rockledge Hospital, Inc., a Delaware corporation, owns and operates Rockledge Regional Medical Center located in Rockledge, Florida. Steward Rockledge Hospital,

Inc., is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

25.     Defendant Steward Melbourne Hospital, Inc., a Delaware corporation, owns and operates Defendant Melbourne Regional Medical Center located in Melbourne, Florida. Steward Melbourne Hospital, Inc., is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

26.     Defendant Steward Trumbull Medical Hospital, Inc., a Delaware corporation, owns and operates Trumbull Regional Medical Center located in Warren, Ohio. Steward Trumbull Medical Hospital, Inc., is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

27.     Defendant Steward Sharon Regional Health System, Inc., a Delaware corporation, owns and operates Sharon Regional Medical Center located in Sharon, Pennsylvania. Steward Sharon Regional Health System, Inc., is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

28.     Defendant Steward Easton Hospital, Inc., a Delaware corporation, owns and operates Easton Hospital located in Easton, Pennsylvania. Steward Easton Hospital, Inc., is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

29.     Defendant Steward Medical Group, Inc., (formerly known as Steward Physician Network, Inc.), a Massachusetts corporation, employs multi-specialty physician groups and physicians practicing at Steward's hospitals located in Massachusetts. Steward Medical Group is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

30.    Defendant Steward Health Care Network, Inc., ("SHCN"), a Delaware corporation, consists of a network of primary care physicians and specialists serving the Steward Health Care System in ten states. It is also responsible for Steward's managed care contracts, medical management services, quality improvement programs, and data analysis and information services. SHCN also performs the Medicare and Medicaid billing functions for Steward's hospitals located in Massachusetts and physicians employed by Steward Medical Group. SHCN is a subsidiary of SOH and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

31.    Defendant Steward Medicaid Care Network, Inc., ("SMCN"), a Delaware corporation, is a Medicaid Accountable Care Organization. SMCN is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

32.    Defendant Steward Integrated Care Network, Inc., ("SICN"), a Delaware corporation, is a Medicare Accountable Care Organization. SICN is a subsidiary of SHCN and SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

33.    Defendant Steward National Care Network, Inc., ("SNCN"), a Delaware corporation, is an Accountable Care Organization. SNCN is a subsidiary of SHCS and maintains its principal office at 111 Huntington Ave., Suite 1800, Boston, Massachusetts.

34.    At all times relevant to the allegations herein, the financial and operational management, supervision, control, and reporting by and between SHCS, Steward St. Elizabeth's Medical Center of Boston, Inc., Steward Holy Family Hospital, Inc., Steward Good Samaritan Medical Center, Inc., Steward St. Anne's Hospital Corporation, Steward Norwood Hospital, Inc., Steward Carney Hospital, Inc., Nashoba Valley Medical Center, A Steward Family Hospital, Inc., Morton Hospital, A Steward Family Hospital, Inc., Quincy Medical Center, A Steward Family Hospital,

10

Inc., New England Sinai Hospital, A Steward Family Hospital, Inc., Steward Good Samaritan Radiation Oncology Center, Inc., Steward Sebastian River Medical Center, Inc., Steward Rockledge Hospital, Inc., Steward Melbourne Hospital, Inc., Steward Trumbull Medical Hospital, Inc., Steward Sharon Regional Health System, Inc., Steward Easton Hospital, Inc., Steward Medical Group, SHCN, SMCN, SICN, and SNCN (collectively referred to herein as "Steward") have been so inextricably intertwined that in effect they have functioned as one single entity.

35.     Defendant Cerberus Capital Management, L.P. ("Cerberus"), a Delaware limited partnership, is a private investment firm that by and through one or more of its investment portfolios or funds, owns and controls SHCS and its subsidiaries and affiliates. Cerberus maintains its principal office at 875 Third Avenue, New York, New York.

## IV.  LEGAL BACKGROUND

### A.     APPLICABLE ANTI-FRAUD STATUTES

#### 1.     The Federal False Claims Act

36.     The Federal FCA imposes liability on:

[A]ny person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), … or (G); [or]

* * *

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]

11

31 U.S.C. §§ 3729(a)(1)(A)-(C) & (G).

37.     The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent to defraud is not required. *See* 31 U.S.C. § 3729(b)(1)(B).

38.     Section 3729(a)(1) of the Federal FCA provides that a person is liable to the United States government for three times the amount of damages that the government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), 64 Fed. Reg. 47099, 47103 (1999), and 28 C.F.R. § 85.3 (2015), the Federal FCA civil penalties were adjusted to $5,500 to $11,000 per violation for violations occurring on or after October 23, 1996. In accordance with the Federal Civil Penalties Inflation Adjustment Act of 2015, the Federal FCA civil penalty amounts were again adjusted, this time to $10,957 to $21,916 per violation for violations occurring after November 2, 2015. *See* 28 C.F.R. §§ 85.3 & 85.5 (2016); 81 Fed. Reg. 42491, 42500 (2016). Thereafter, the civil penalties have been adjusted annually and, for penalties assessed after January 29, 2018, are $11,181 to $22,363 per violation.

39.     As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 759, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of [the Federal AKS] constitutes a false or fraudulent claim for purposes of [the Federal FCA]." As stated in the legislative history of the PPACA, the purpose of this amendment was to clarify "that all claims resulting from illegal

kickbacks are considered false claims for the purpose of civil actions under the [Federal FCA], even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854 (Oct. 28, 2009).

### 2.     The Massachusetts False Claims Act

40.     The Massachusetts FCA imposes liability on:

Any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) conspires to commit a violation of this subsection;

(4) knowingly presents, or causes to be presented, a claim that includes items or services resulting from a violation of [the Federal AKS or Massachusetts AKS];

***

(10) is a beneficiary of an inadvertent submission of a false claim to the commonwealth or a political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment and fails to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by the later of: (i) the date which is 60 days after the date on which the false claim or receipt of overpayment was identified; or (ii) the date any corresponding cost report is due[.]

Mass. Gen. Laws ch. 12, § 5B(a)(1)-(4), (10).

41.     The term "knowingly" means "possessing actual knowledge of relevant information, acting with deliberate ignorance of the truth or falsity of the information or acting in reckless disregard of the truth or falsity of the information." Mass. Gen. Laws ch. 12, § 5A. Proof of specific intent to defraud is not required. *See id.*

13

42.     Any person who violates Mass. Gen. Laws ch. 12, § 5B(a) is liable to the Commonwealth for three times the amount of damages, including consequential damages, that the Commonwealth sustains plus a civil penalty of no more than $11,000 and no less than $5,500 for each false claim submitted on or before November 2, 2015, and civil penalties of no more than $21,916 and no less than $10,957 for each false claim submitted on or after November 3, 2015. *See* Mass. Gen. Laws ch. 12, § 5B(a).

### 3.     The Federal Anti-Kickback Statute

43.     The primary purpose of the Federal AKS, 42 U.S.C. § 1320a-7b(b), is to protect patients and the government health care programs from the corruptive influence of kickbacks and bribes on treatment decisions. The government health care programs rely upon medical providers to furnish treatment that is medically necessary and appropriate. Kickbacks and bribes taint the decisions of providers and beneficiaries and compromise the integrity of the provider-patient relationship.

44.     To protect patients and the government health care programs from medically unnecessary treatment, treatment of inferior quality, and harmful treatment, Congress enacted the Federal AKS in 1972, barring the payment of kickbacks and bribes to providers. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) & (c). Congress subsequently strengthened the statute in 1977 and again in 1987 to ensure that kickbacks disguised as legitimate transactions do not evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

14

45.     Violation of the Federal AKS is a felony punishable by fines and imprisonment and can also result in exclusion from participation in federal health care programs. *See* 42 U.S.C. §§ 1320a-7b(b)(2) & (7).

46.     Specifically, the Federal AKS makes it illegal for individuals or entities to "knowingly and willfully offer[] or pay[] remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person ... to purchase, ... order, ... or recommend purchasing ... or ordering any good ... service or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

47.     In order to establish a violation of the Federal AKS, one must allege that the defendant knowingly and willfully: (1) offered or paid remuneration of any kind, directly or indirectly that was (2) intended in any part to induce the utilization of federal health care services.

48.     The term "remuneration" includes anything of value, in whatever form, whether in cash or in kind, or offered directly or indirectly. AKS violations do not contain a fair market value or commercial unreasonableness element. As long as remuneration is intended to induce referrals, it is unlawful — even where the remuneration is fair market value or commercially reasonable. *See United States ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 677 (W.D. Pa. 2014).

49.     "Intent to induce" is shown if one purpose of payment was to induce referrals of federal health care business. *United States v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20, 30 (1st Cir. 1989).

50.     Claims submitted or caused to be in submitted while in knowing violation of the Federal AKS are false claims.

15

### 4.    The Massachusetts Anti-Kickback Statute

51.    The Massachusetts AKS makes it illegal for individuals or entities to:

(a)    solicit[] or receive[] any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for purchasing, leasing, ordering or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part [by MassHealth]; or

(b)    offer[] or pay[] any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind to induce such person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part [by MassHealth.]

Mass. Gen. Laws ch. 118E § 41.

52.    It is a violation of the Massachusetts FCA to knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of the Massachusetts AKS. *See* Mass. Gen. Laws ch. 12, § 5B(a)(4).

53.    In addition, violation of the Massachusetts AKS is a felony punishable by fines and imprisonment. *See* Mass. Gen. Laws ch. 118E § 41.

### 5.    The Stark Statute

54.    The Stark Statute, 42 U.S.C. § 1395nn, prohibits entities that provide health care services, including hospitals, from being reimbursed by Medicare or Medicaid for "designated health services" if such services are the result of a referral from a physician with whom the health care entity has a "financial relationship," unless a statutory exception applies.

55.    "Designated health services" include, among other services and items:

- inpatient and outpatient hospital services
- clinical laboratory services
- physical therapy services
- occupational therapy services
- radiology services
- radiation therapy services and supplies

16

- outpatient prescription drugs

42 U.S.C. § 1395nn(h)(6).

56.     One of Congress's principal objectives in enacting the statute was to prevent the losses

that the government and taxpayers could suffer as a result of questionable utilization and other

abuses of health services that occur when physicians have financial relationships with certain

ancillary service entities to which they refer Medicare and Medicaid patients. *See* 69 Federal

Register 16124 (Mar. 26, 2004).

57.     The Stark Statute provides that the United States will not pay for designated health

services referred by a physician who has an improper financial relationship with the billing

provider. *See* 42 U.S.C. § 1395nn(g)(1).

58.     For purposes of the Stark Statute, a "financial relationship" includes a "compensation

arrangement," which means any arrangement between a physician and an entity under which the

entity pays any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to the

physician. 42 U.S.C. §§ 1395nn(a)(2)(B) & (h)(1)(A)-(B); 42 C.F.R. § 411.354(c).

59.     The Stark Statute and its companion regulations contain exceptions for certain types of

"compensation arrangements." 42 U.S.C. § 1395nn(e). For a compensation arrangement to

qualify for an exception, the remuneration and payments under the relationship and arrangement

must not be determined in a manner that takes into account the volume or value of any referrals.

*See id.*

60.     The Stark Statute also applies to claims under Medicaid, as 42 U.S.C. § 1396b(s)

prohibits the use of federal funds to pay for designated health services provided to Medicaid

beneficiaries when such services are the result of a prohibited referral. *See* 42 U.S.C. § 1396b(s).

61.     In addition, any entity collecting payment for a health care service resulting from a

prohibited referral must refund all collected amounts on a timely basis. 42 U.S.C. §

1395nn(g)(2); 42 C.F.R. § 411.353(d).

62.     In pertinent part, the Stark Statute provides:

    (a)  Prohibition of certain referrals

        (1)  In general

            Except as provided in subsection (b) of this section [which sets forth
general exception to both ownership and compensation arrangement
prohibitions], if a physician ... has a financial relationship with an entity
specified in paragraph (2), then –

            (A)  the physician may not make a referral to the entity for the
furnishing of designated health services for which payment
otherwise may be made under this subchapter, and

            (B)  the entity may not present or cause to be presented a claim under
this subchapter or bill to any individual, third party payor, or other
entity for designated health services furnished pursuant to a referral
prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

## B.      APPLICABLE GOVERNMENT HEALTH CARE PROGRAMS

### 1.      The Medicare Program

63.     The United States, through HHS and CMS, administers the Medicare Program primarily

for persons 65 and older and the disabled. The Medicare program was established by Title XVIII

of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*

64.     The Medicare program is divided into four "parts" that cover different services. Medicare

Part A generally covers inpatient hospital services and services for patients with end-stage renal

disease (ESRD). Medicare pays hospitals and ESRD providers a bundled rate under its

prospective payment system (PPS).

18

65.     Medicare Part B generally covers outpatient physician services, including prescription drugs administered "incident to" physician services.

66.     Medicare Part C provides for private companies to offer "Medicare Advantage" plans that include, at a minimum, all benefits covered by Parts A and B. Medicare pays a fixed monthly amount per beneficiary to the private companies that offer Medicare Advantage plans.

67.     Medicare Part D, effective January 1, 2006, provides prescription drug benefits by means of private companies referred to as Part D sponsors.

68.     Medical necessity is a fundamental requirement for Medicare coverage. Medicare does not cover any expenses incurred for services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury …." 42 U.S.C. § 1395y(a)(1)(A).

69.     It is the obligation of every health care provider seeking reimbursement under Medicare to assure that services it provides "(1) will be provided economically and only when, and to the extent, medically necessary; (2) will be of a quality which meets professionally recognized standards of health care; and (3) will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing quality improvement organization in the exercise of its duties and responsibilities." 42 U.S.C. § 1320c-5(a).

70.     In order to assess the reasonableness and necessity of those services and whether payment is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that: "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or

19

other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 1395l(e).

### 2.      The MassHealth Program

71.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The Commonwealth of Massachusetts administers a state Medicaid program, which it calls MassHealth. The federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. *See* 42 U.S.C. §§ 1396, 1396a(a)(13) & (a)(30)(A). MassHealth has opted to cover prescription drugs.

72.     Providers participating in MassHealth submit claims for services rendered to Medicaid recipients to MassHealth for payment.

73.     MassHealth directly pays providers for reimbursable items and services, obtaining the federal share of the payment from accounts that draw on the United States Treasury. *See* 42 C.F.R. §§ 430.0 - 430.30. At all relevant times, the federal share of MassHealth's expenditures has been 50%.

### 3.      Providers' compliance with the Federal AKS, Stark Statute, and Massachusetts AKS are material to Medicare's and MassHealth's payment decisions

74.     To be eligible to participate in the Medicare program and be reimbursed for treatment provided to Medicare beneficiaries, providers are required to enter into an agreement in which the provider makes the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but

20

not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application (CMS-855B).

75.     Providers who participate in MassHealth must enter into a provider contract with the Commonwealth. By executing such contract, the provider agrees to, among other things, "comply with all laws, rules, and regulations governing MassHealth." 130 Mass. Code Regs. 450.223(C).

76.     MassHealth providers must affirmatively certify, as a condition of payment of the claims submitted for reimbursement by MassHealth, compliance with applicable federal and state laws and regulations, including the Federal AKS, Stark Statute, and Massachusetts AKS.

77.     On each Form CMS-1500 submitted to Medicare or Medicaid for payment for drugs and services furnished to beneficiaries, a provider certifies, among things, that the claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal [AKS] and [Stark Statute]" and that "the services on th[e] form were medically necessary":

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; ... 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE ....

78.     On each annual cost report (Form CMS-2552-10) submitted to CMS (via the Medicare Administrative Contractor), a hospital's administrator certifies that the services

21

furnished to Medicare and Medicaid beneficiaries identified in the report were provided in compliance with the laws and regulations governing the provision of health care services:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

> I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by _____(Provider Name(s) and Number(s))for the cost reporting period beginning _____ and ending _____ and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

79.     Compliance with the Federal AKS, Stark Statute, and Massachusetts AKS are material conditions of payment for Medicare and Medicaid claims. Claims for payment for services that are tainted by illegal kickbacks are not authorized to be paid by Medicare and Medicaid and thus constitute claims that are both legally and factually false.

80.     HHS has also published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the Federal AKS because such practices are unlikely to result in fraud or abuse. *See* 42 C.F.R. §1001.952. However, only those arrangements that precisely

meet all of the conditions set forth in a safe harbor are afforded safe harbor protection. None of the practices at issue here meet these safe harbor regulations.

### 4.    The Accountable Care Organization Programs

81.    A key component of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, enacted on March 23, 2010[1], ("the Affordable Care Act"), is the Medicare Shared Savings Program ("Shared Savings Program"). The Shared Savings Program is intended to encourage the development of Accountable Care Organizations ("ACOs") in Medicare. Its focus is on improving the administration of health care under Medicare Parts A and B with three primary aims: (1) better care for individuals, (2) better health for populations, and (3) lower growth in Medicare Parts A and B expenditures.

82.    ACOs are comprised of doctors, hospitals, and other allied health care providers that form networks that agree to share information, coordinate patient care, and avoid unnecessary tests and procedures as to a defined group of Medicare Part A and Part B beneficiaries. ACO participants generally focus on achieving quality benchmarks, promoting preventive care, and managing patients with chronic illnesses. The use of electronic health records to facilitate communication amongst providers and data integration and management is key.

83.    The beneficiaries covered by an ACO are generally assigned on the basis of the primary care physician ("PCP") of the beneficiary. Medicare expressly provides that beneficiary assignment to an ACO for purposes of determining the patients for whom that ACO is accountable "in no way diminishes or restricts the rights of beneficiaries assigned to an ACO to exercise free choice in determining where to receive health care services." 42 C.F.R.

---

[1] Certain provisions of this legislation were amended by enactment of the Health Care and Education Reconciliation Act of 2010 on March 30, 2010.

§ 425.400(b). And each patient is free to have their patient data excluded for purposes of determining an ACO's quality metrics.

84.      ACOs are paid on the basis of a variety of reimbursement models depending on the type of ACO and the payment options each ACO type offers. As to all ACO reimbursement methodologies however, providers are financially incentivized to keep their patients healthy and out of the hospital. In particular, as an incentive to ACOs that successfully meet quality and savings requirements, Medicare can share a percentage of the savings with the ACO. ACOs only share in savings, however, if they meet both the quality performance standards and generate shareable savings.

85.      The foundation of an ACO as configured under CMS regulations is generally each participant's PCP. He or she is ultimately the provider overseeing the participant's care and tracking the patient through the ACO system.

86.      Since the passage of the Affordable Care Act, Medicare ACO options have expanded to include the Pioneer ACO Model, the Medicare Shared Savings Plan ("MSSP"), and the Next-Generation ACO, which allows for a higher level of risk, and a higher potential upside. As of 2017 there were approximately 525 Medicare ACOs serving over 10 million beneficiaries in the United States.

87.      Because ACOs are networks of physicians, hospitals, and other health care providers, and because CMS reimburses them as an entity, ACOs are naturally interested in taking steps to minimize "leakage," *i.e.*, the provision of medical care to ACO patients by out-of-network providers. Such patient leakage results in a revenue loss to the ACO, since the patient in such circumstances receives reimbursable treatment by an unaffiliated provider rather than from within the ACO. It also complicates the group practice reporting process through which ACOs

24

must submit data to CMS which CMS then utilizes to calculate multiple quality metrics used in the determination of bonus payments to the ACO. *See* 42 C.F.R. § 425 Subpart F. Patient leakage occurs for numerous reasons, including the referral of patients to out-of-network providers by in-network providers. But ACOs' interest in minimizing patient leakage does not negate or impact in any manner the ACOs' statutory prohibition from paying an in-network physician to reduce or limit medically necessary services to its patients. *See* 42 U.S.C. § 1320a-7a. Similarly, ACOs are prohibited from issuing payments to physicians to use a drug or device known to be clinically less effective. *See* Final Waivers in Connection with the Shared Savings Program, 80 Fed. Reg. 66,730 (Oct. 29, 2015).

88.     The quality measures that ACOs report and which CMS utilizes to calculate and assess quality performance pertain to four domains including the patient/caregiver experience, care coordination/patient safety, clinical care for an at-risk population (*e.g.,* diabetes, hypertension, ischemic vascular disease, and depression), and preventive health (*e.g.,* colonoscopies, blood pressure screenings, and weight screenings). Calculations are arrived at utilizing several types of data, such as Medicare claims data, and, most significantly, ACOs' self-reported data.

89.     As CMS observed in its comments to the Final Rule issued on November 2, 2011:

> The purpose of the Shared Savings Program is to achieve savings through improvements in the coordination and quality of care, and not through avoiding certain beneficiaries or placing limits on beneficiary access to needed care.

Medicare Shared Savings Program: Accountable Care Organizations, 80 Fed. Reg. 67,805 (Nov. 2, 2011). All else being equal, the better the metrics an ACO reports to CMS, the larger the potential savings it will be able to share in with CMS.

90.     Members of MassHealth's ACOs receive primary care services from their selected or assigned PCP. *See* 130 Mass. Code Regs. 508.006(B)(2). If the member requires other medical

25

services (not including emergency services, behavioral health services, pregnancy services, or family planning services), the member may be required obtain a referral for such services from the PCP. *See id.* The primary care provider may refer the patient to a physician who participates in the PCP's ACO network or to another MassHealth's broader physician network. *See* Steward Health Choice Member Handbook 2018 (available at https://stewardhealthchoice.org/sites/default/files/2018-02/2018%20Member%20Handbook_Steward%20Health%20Choice_1.pdf) at 6, 11.

91.    Under Massachusetts law, MassHealth hospital patients have "the right to freedom of choice in his selection of a facility, or a physician or health service mode, except in the case of emergency medical treatment or as otherwise provided for by contract[.]" Mass. Gen. Laws ch. 111 § 70E.

## V.  **FACTUAL ALLEGATIONS**

### A.    **The Genesis And Expansion Of Steward To The Largest Privately-Owned For-Profit Hospital Operator In The United States**

92.    Steward Health Care System was created in 2010 when Cerberus bought the former Caritas Christi network of Catholic hospitals and its affiliated entities. That same year, with approval of the Massachusetts Attorney General and the Massachusetts Supreme Judicial Court, as well as the Vatican, Cerberus turned the hospital chain from a nonprofit charity to a for-profit business.

93.    Steward went on to expand throughout eastern Massachusetts, acquiring Nashoba Valley Medical Center (Ayer, Massachusetts), Merrimack Valley Hospital (Haverhill, Massachusetts), Quincy Medical Center (Quincy, Massachusetts) and Morton Hospital (Taunton, Massachusetts).

94.    In May 2017, Steward acquired a rehabilitation hospital as well as six more general hospitals, including Sharon Regional Health System (Sharon, Pennsylvania), Easton Hospital

26

(Easton, Pennsylvania), Wuesthoff Medical Center in Melbourne (Melbourne, Florida), Wuesthoff Medical Center in Rockledge (Rockledge, Florida), Sebastian River Medical Center (Sebastian, Florida), and Trumbull Memorial Hospital (Warren, Ohio).

95.     In or about May 2017, Steward Health Care LLC also merged operations with IASIS Healthcare LLC, adding hospitals in locations across Utah, Arizona, Colorado, Texas, Arkansas, and Louisiana. This merger made Steward the largest private for-profit hospital operator in the United States.

96.     Cerberus continues to be the majority owner of SHCS.

97.     SHCS's Board of Directors is comprised of a Chairman (SHCS's CEO, Ralph de la Torre, M.D.) and seven other Directors, five of which are executives or managers of Cerberus or an affiliate of the investment company:

- Brett Ingersoll (Co-Head of Private Equity and member of the Investment Committee at Cerberus)

- Lisa Ann Gray, Esq. (General Counsel of Cerberus Operations Advisory Company, LLC and a member of its executive team)

- James T. Lenehan (Senior Operations advisor to Cerberus)

- Chan Galbato (Chief Executive Officer of Cerberus Operations and Advisory Company, LLC)

- Michael K. Palmer (Senior Vice President in the Private Equity Group of Cerberus)

Thus, Cerberus controls the majority of the SHCS's Board of Director seats and thus has control over the operations of SHCS.

98.     In or about 2016, Steward undertook steps to financialize and diffuse responsibility among its hospital operations. Toward this end, in a lease-buy back transaction, Steward sold the real estate interests of its hospitals to Medical Properties Trust, Inc. ("MPT") a publicly traded company. As part of that transaction, a Cerberus affiliate agreed to invest $150 Million in MPT

common stock. The agreement also included a right of first refusal for MPT to acquire additional

Steward hospitals. As a consequence of the transactions, Steward lost the real estate interests of its

hospitals and became obligated to pay large lease payments to its new landlord, MPT. In contrast,

Cerberus recovered all of the money it had originally invested. On top of that, Steward managers

received large stakes in the company.

99.     CMS launched its Medicare Pioneer ACO program in January 2012, and SHCS signed

onto and adopted Medicare's Pioneer ACO model in 2012 shortly after CMS launched the

program. Based upon its second year with the program, Steward proclaimed itself to have had

the best performance among Pioneer ACOs in Massachusetts and the second-best performance of

all Pioneer ACOs in the nation. Then, four years after first adopting the Medicare ACO model,

Steward leapt on board when CMS introduced its new Next Generation ACO model in 2016.

This new model set financial targets, furnished providers and beneficiaries' greater opportunities

to coordinate care, and aimed to attain the highest quality standards of care. And Steward

promoted its ACO model to patients and prospective patients through an enthusiastic Internet

marketing campaign. Steward's ACOs include among its beneficiaries many thousands of

individuals receiving traditional Part A and Part B Medicare.

100.    In or around 2017, Steward joined MassHealth's pilot Medicaid ACO program with the

stated aim to increase care management and care coordination for Medicaid patients.

101.    Steward articulated on the Internet and in press releases the goals of the ACO models as

(1) improving the patient experience of care (including quality and satisfaction), (2) reducing the

per capita cost of health care, and (3) improving the health of its aligned population.

102.    Rather than actually aiming for the goals of the Medicare and Medicaid ACO models,

Steward in fact corrupted the models and exploited the anticipated coordination of care as a

means of trapping Medicare and Medicaid patients in its health care "system" to the detriment of its patients and for its own financial benefit, as set forth more fully below.

103.    The illegal policies, practices, and conduct alleged herein with respect to the Steward hospitals and providers located in Massachusetts have been implemented and are occurring across the Steward enterprise, including at the Sebastian River Medical Center located in (Sebastian, Florida), Rockledge Regional Medical Center (Rockledge, Florida), Melbourne Regional Medical Center (Melbourne, Florida), Trumbull Regional Medical Center (Warren, Ohio), Sharon Regional Medical Center (Sharon, Pennsylvania), and Easton Hospital (Easton, Pennsylvania).

**B.    Steward's Fraudulent Schemes That Result In The Submission Of False Claims**

  **1.    To fraudulently inflate profits and improve its ACO's metrics, Steward forces patients, which include Medicare Part A and Part B patients and MassHealth patients, to receive their care from providers within Steward's ACO network**

104.    Since Cerberus acquired Steward in 2010 and converted it to a for-profit corporation, the animating force behind Steward's business plan has been rampant greed. Meanwhile, quality patient care, and integrity in its dealings with patients and the government health care programs, have become secondary considerations.

105.    A hallmark of Medicare Part A and Part B and Medicaid is that these programs do not impose limits on which health care provider a patient may utilize. The statutes and regulations governing Medicare's ACOs do not impinge on this freedom to choose in any way. Indeed, providers employed by the ACO, or those having a contractual relationship with the ACO, "remain free to make referrals without restriction or limitation if the beneficiary expresses a preference for a different provider, practitioner or supplier; or the beneficiary's insurer determines the provider, practitioner, or supplier; or the referral [within the ACO] is not in the

beneficiary's best medical interests in the judgment of the referring party." 42 C.F.R.

§ 425.304(c)(2). Similarly, provider choices that MassHealth beneficiaries have under the terms

of their health insurance plan cannot be overridden by Steward in order to corral more patients

into the Steward ACO's network of providers.

106.     Indeed, Steward is aware of this prohibition against impinging upon the freedom to

choose one's doctors, hospitals and medical suppliers. Steward's website makes the following

"promise" about its Next Generation ACO: "Your doctor's participation in this Model does not

change anything about your Medicare benefits and it does not limit the doctors you can choose to

see. **Every benefit you currently have under Medicare remains the same**." (Steward's

website - *https://www.steward.org/medicareACO/NGACO*) (emphasis in original).

107.     Nevertheless, in an effort to boost revenues, Steward routinely traps unsuspecting ACO

beneficiaries, and other patients, within Steward's system in direct violation of 42 C.F.R.

§ 425.400, 42 C.F.R. § 425.304, Medicare Parts A and B's requirements, and MassHealth's

requirements. In so doing, Steward is denying patients a critical feature of traditional Medicare

and Medicaid, namely, the right to choose which doctors, hospitals and suppliers will provide

their care. Additionally, and again in direct violation of 42 C.F.R. § 425.400, 42 C.F.R.

§ 425.304, Medicare Parts A and B's requirements, and MassHealth's requirements, patients are

being denied the benefit of their own physician's medical judgment, especially when that

physician has concluded that his/her patient is best served by being referred out of network for

treatment by another physician or another hospital.

108.     Utilizing a variety of tactics, Steward routinely denies beneficiaries access to health care

outside of Steward's ACO network. For instance, physicians within the SHCN are required to

prepare and submit out of network referral requests before a patient will be allowed to receive a

referral to an out of network physician. Such referrals are ostensibly permitted under either one of two circumstances: (1) when the patient has a pre-existing relationship with an out of network physician, or (2) there are no "comparable" in-network physicians or services available. However, Steward's definition of "comparable" is so broad as to be functionally meaningless. The reality is that out of network referral requests, no matter what the reason, are almost universally denied.

109.    For example, after acquiring Caritas Christi in 2010, Steward stopped approving Dr. Zappala's referrals, including for patients covered by traditional Part A and Part B Medicare, of patients with kidney tumors to tertiary specialty institutions such as the Lahey Clinic and the Dana Farber Cancer Center to have partial kidney resections performed in lieu of removal of the entire kidney. This innovative technique was undeniably in the patients' best interests. Nevertheless, when Dr. Zappala made these referrals over Steward's objections, Dr. Mark Girard, president of SHCN and other Steward entities at various times, responded by confronting Dr. Zappala directly. Even after Dr. Zappala laid out for him the multiple benefits of this treatment technique and explained that no one affiliated at Steward could perform it, Dr. Girard nonetheless instructed Dr. Zappala to keep these patients in the Steward ACO network, even if it required removing their entire kidney. He warned Dr. Zappala that he would be held accountable and financially penalized if he continued to make these out of network referrals.

110.    Dr. Zappala also was reprimanded when he referred certain prostate cancer patients to the Lahey Clinic in Burlington, Massachusetts. Lahey Clinic was the only hospital in New England at all times relevant to this allegation offering high dose, transperineal radiation iridium therapy to treat select patients with high grade prostate cancer. This innovative treatment not only yielded materially better results – patients who received it had a lower rate of reoccurrence – but

31

also avoided many of the significant side effects of other cancer treatments because it better

focused the radiation on the prostate. Nevertheless, it was not available at Holy Family Hospital.

Representatives of Steward and Holy Family Hospital, including Dr. Chastain, admonished Dr.

Zappala for referring patients to the Lahey Clinic to receive the high dose radiation iridium

implants. And even though at least one of Holy Family Hospital/Steward's representatives (Dr.

Santosh Shetty) agreed with Dr. Zappala regarding the benefits of high dose radiation iridium

implants, none of them were willing to approve or otherwise condone this leakage. Instead,

patients who were eligible for this superior treatment offered only at the Lahey Clinic, including

patients covered by traditional Part A and Part B Medicare, were required to be treated with

inferior methods at Holy Family Hospital, a requirement which was clearly not in the interests of

administering quality medical care.

111.    Steward prevented doctors from gaining access to robot assisted surgery when the

Steward hospital in question did not have such equipment, even though it is better for the patient

in multiple respects. Dr. Zappala believed it was in the best interests for certain of his patients at

Holy Family Hospital to have robot assisted surgery. Holy Family Hospital, however, did not

have the necessary robotic equipment. Therefore, Dr. Zappala made numerous requests to the

president and CEO of Holy Family Hospital and the chief of the medical staff at Holy Family

Hospital to either purchase this equipment or permit his patients to receive their surgical

procedures out of network. These requests were denied during a dinner meeting with Holy

Family Hospital's president, Lester Schindel, and medical staff president, Vartan Yeghiazarians,

M.D. He then appealed to Dr. Girard. In response, Steward not only refused to permit Dr.

Zappala to operate on his own patients out of network, it also withheld his annual bonus in 2014

(approximately $25,000) and threatened to expel him from the SHCN. Dr. Zappala believes his

32

bonus was withheld at least in part because of his persistent efforts to exercise his best medical judgment and refer his patients out of network to undergo robot assisted surgery.

112.    Throughout 2014 and 2015, Dr. Zappala requested that Steward purchase the equipment that would enable minimally invasive saline bipolar transurethral prostatectomies to be performed on an outpatient basis (versus a two-night stay without this equipment) and without the need for a blood transfusion. Aside from the shorter stay (and decreased cost) the benefit also included decreased morbidity and mortality. Not only did Steward reject Dr. Zappala's request, Dr. Peter Rees, a Steward Medical Group physician, thereafter began calling Dr. Zappala's patients directly and falsely telling them that they must get their prostate surgeries performed at Holy Family Hospital and Holy Family Hospital only. On information and belief, during this same time period, Dr. Rees was making similar calls to the patients of other doctors who sought to refer their patients out of network in order to force such patients to stay with Steward physicians and facilities.

113.    Defendants unlawfully reassign Medicare patients to in-network Steward physicians. For example, Steward agents call Medicare patients and falsely tell them that certain disfavored physicians cannot accept Medicare patients or that surgery must be performed at a Steward facility. Likewise, when a PCP within Steward announces that he or she is leaving, Steward reassigns the patient to another Steward PCP without obtaining the patient's informed consent.

114.    Steward imposes significant financial penalties and applies psychological pressure on physicians to ensure that their patients receive all care from providers within Steward's ACO network. For example, physicians whose leakage rates are unsatisfactory are publicly shamed during physician group, or POD, meetings where their leakage rates are displayed on PowerPoint slides for all attendees to compare. Physicians are berated and even face termination if their

33

leakage rates do not improve. Comparative leakage reports are also distributed. These comparative reports engender not just competition but hostility, because individual physician bonuses depend on the performance of their POD collectively.

115.    The financial penalties that Steward imposes on physicians who refer out of network are significant and intended to discourage such referrals. A certain percentage of compensation owed to the physician is withheld for each pay period. Steward only returns the amounts withheld if certain performance criteria are satisfied, one of which is the rate of out of network leakage.

### 2.    Steward induced referrals to providers within its ACO network in violation of the Federal AKS, Stark Statute, and Massachusetts AKS, thereby causing the submission of false and fraudulent claims

116.    Within Steward, specialists received monetary inducements and other things of value to keep patients within Steward's ACO network. According to Dr. Lanna, this practice is generally known by the physicians and widespread within Steward's ACO network.

117.    **Sham "Call Coverage" Contracts:** Sham contracts are utilized to provide kickbacks to urologists to induce them to refer their cancer patients to Steward's providers. In late 2016, several weeks before Mr. Wojcik was notified that he was going to be terminated in order to save costs, he was informed by Good Samaritan Medical Center's president, John Jurczyk, that he was responsible for approving the timesheets submitted by a urologist for payment of $180,000 under a contract entered into between Good Samaritan Medical Center and the urology group. It was Mr. Wojcik's understanding that the contract between the two entities had been in place for several years. However, it was not until he received this notification along with the contract and time sheet via email that he became privy to the details of the arrangement. Upon examining the contract, Mr. Wojcik discovered that it referenced Good Samaritan Medical Center as a "Prostate Cancer Center of Excellence" and various responsibilities of the urologist under the contract.

34

Because of the duties of Mr. Wojcik's position he knew that the urologist had not performed the responsibilities listed in the contract. He was unaware of such a "Center" and had never heard that designation used before in reference to his department. The contract also contained a *pro forma* which showed the direct impact on patient volume and revenues that cancer referrals from the urology group would have on Good Samaritan Medical Center.

118.    After reviewing the contract and checking Steward's policy, which confirmed that only the President could approve payments to physicians, Mr. Wojcik went to his direct supervisor, the Vice President of Patient Care and Chief Nursing Officer, Lisa Zani, and explained that the services described as being provided by the urologists under the contract would be very useful but that they were not actually being furnished. Moreover, the timesheet showed that just one hour per day was spent on the contracted for activities. Yet Good Samaritan Medical Center was paying $15,000 per month ($180,000 per year) to the urology group, an amount which bore no rational relationship to: (1) the minimal amount of work the timesheet showed being done, and (2) the fact that, to the best of Mr. Wojcik's knowledge, none of the services described in the contract were even performed. Mr. Wojcik told his supervisor he would not sign the timesheet because, under Steward's policy, only the President could sign it and, in any event, the services had not been provided.

119.    In response, Ms. Zani took the contract and told Mr. Wojcik that she would put the contract on the pile of other similar contracts the current president, John Jurczyk, had inherited from the previous president. She said the contract was actually for "call coverage" (a service not even mentioned in the contract and one for which urology groups do not receive separate compensation). At the vice president's request, Mr. Wojcik then reviewed the contract with the CFO, Victoria Lobban. In the course of his review, the CFO showed Mr. Wojcik a binder with

35

what she described as similar contracts and told Mr. Wojcik that the practice of entering into

these contracts is widespread at Steward. Mr. Wojcik believes he was terminated, at least in part,

because he voiced his belief to his vice president and to the CFO that this contract and the

"Prostate Cancer Center of Excellence" appeared to be a sham.

120.    **Leasing Space In Exchange For Patient Referrals:**  Steward incentivizes physicians to

refer patients to Steward in other ways. Vartan Yeghiazarians, M.D., the president of the medical

staff at Holy Family Hospital and physician manager of the ACO, has leased to Steward

approximately 50% of an office building located on Merrimack Street in Methuen,

Massachusetts, that he owns. Steward uses the space for a Steward "minute clinic" and a

marketing office. In exchange, and upon information and belief, Dr. Yeghiazarians only and

exclusively refers his patients to Steward physicians and admits them to Steward facilities.

121.    Likewise, Essex Orthopedics and its owners, Thomas Hoerner, M.D., and Eric Arvidson,

M.D., lease approximately 8,000 square feet of a facility in Andover, Massachusetts, to a

Steward primary care group. In exchange, Essex Orthopedics exclusively performs surgeries at

Steward-owned or Steward-affiliated facilities such as Holy Family Hospital, Andover Surgery

Center, and Orchard Surgery Center. Also as part of the quid pro quo arrangement, Steward

supplies Essex Orthopedics with an MRI machine for no charge. Steward also has provided a

MRI machine to Northeast Orthopedics in North Andover, Massachusetts, free of charge.

      **3.**     **Steward prohibits physicians from exercising their best medical judgment
for their patients and has undermined the doctor-patient relationship,
thereby causing the submission of false claims**

122.    Steward's treatment of its patients has been entirely corrupted by its "keep the patient in

network no matter what" policies. While these policies have enabled Steward to inflate its ACO

metrics, and more generally its revenues, they have simultaneously undermined the ability of its

physicians to exercise their best medical judgment in treating their patients. Time and again
Steward has seen to it that physicians' medical judgment and patients' wishes are ignored and
overruled. Referrals to specialists have been categorically denied, requests for the best modes of
treatment for life threatening illnesses and chronic conditions have been overruled, and
physicians are constantly subjected to the threat of financial punishment, psychological pressure,
and termination if they do not fall into line and comply with Steward's policies.

###   4.   Steward's providers routinely over prescribe narcotics and other controlled substances to patients, thereby causing the submission of false claims

123.   Soon after her arrival at Steward, Dr. Lanna observed that elderly patients under the care
of other physicians were routinely being prescribed excessive amounts of narcotics and other
controlled substances, such as benzodiazepines and Adderall, often in combination. Such patients
landed in emergency rooms with syncope as a consequence. One patient went to the emergency
room in early 2017 with syncope after multiple fainting spells. Further, appropriate testing had
not been undertaken to monitor the patients and confirm the medical necessity of continuing the
prescribed drug regimens. Physicians such as Dr. Lanna, who were not the patients' treating
physician, were routinely being asked to authorize telephone refills for patients when there was
very little clinical information about the patient and the treating physician was not present. Also,
when Dr. Lanna arrived at Steward, she discovered that her office had hundreds of patients who
had been prescribed large quantities of opioid painkillers for extended periods but were not
receiving physical therapy and had no pain management referrals. In March 2015, Dr. Lanna
asked the president of Steward Medical Group, George Clairmont, M.D., via email what
Steward's policy was regarding prescribing drug refills, especially with respect to narcotics,
when the doctor had not seen the patient. Dr. Clairmont responded via email that Steward

Medical Group had no policy. Tellingly, he added that he would "…NOT engage in such a conversation on email." (emphasis in original).

124.    Steward directs providers to prescribe refills of pain medicines for patients who complain about experiencing discomfort or chronic pain in order to ensure that the patients do not switch to an out of network provider and do not report having a poor treatment experience that would negatively impact Steward's patient satisfaction score.

125.    As an example of this unlawful practice, Dr. Lanna observed that a 74-year-old patient had been prescribed a drug cocktail of Valium, Adderall, and Oxycodone but had not been examined by a physician in over seven months. Further, the underlying cause of the patient's chronic knee pain had never been addressed.

126.    In another case, an 80-year-old patient had been prescribed Oxycodone three times a day for several years. The patient, however, was not receiving the testing required for monitoring treatment with opioids, especially at such a high dose.

### 5. Steward engaged in a pervasive pattern of failure to provide adequate patient care, thereby causing the submission of false claims for payment

127.    Upon joining Steward, it quickly became evident to Dr. Lanna that in multiple respects that the medical care Steward patients were receiving was grossly inadequate. In an effort to promote revenue generation and reduce costs within the Steward system, the organization had largely abandoned providing quality patient care as a priority. For example:

(a)    In many instances, patients were receiving narcotics, sometimes for years, despite the lack of any medical necessity, despite the risk of patient harm, and without any ongoing monitoring of the patient by his/her physician. When Dr. Lanna raised this troubling issue with Steward Medical Group's president, Dr. Clairmont, as well as George Gales, M.D., she was met with anger and opposition. Dr. Gales sent a letter to the providers and staff in Dr. Lanna's POD

in which he criticized Dr. Lanna for objecting to prescribing narcotics to patients and said she was not being a "team player" and is a "doctor who doesn't want to share the work." What's more, Dr. Gales misled the staff by advising them that, in raising concerns about Steward's practice of over-prescribing narcotics without monitoring patients or reassessing whether continued use of the drugs was medically reasonable and necessary, Dr. Lanna was advocating "throwing patients into sudden withdrawal," which would cause the patients "irreparable harm." Dr. Lanna perceived that if she continued to raise objections about the manner in which narcotics were being dispensed, her job would be in jeopardy.

(b)     Dr. Lanna reviewed patient charts and found that few, if any, quality measures had been satisfied. Patients were grossly deficient in vaccinations, hypertension management, cholesterol management, and diabetes management, issues comprising the ACO quality metrics. Most obese patients had never had a hemoglobin A1c test to measure their blood glucose level in order to determine if they were diabetic. More generally, patients who fit the typical profile of a diabetic were not given tests to confirm the presence of the condition by their physician in order to avoid the financial penalties that Steward imposed upon physicians when their diabetic patients did not satisfy Steward's internal health metrics or, in other instances, to avoid the high costs associated with treating such a patient when that patient was covered by a capitation-type insurance plan.

(c)     More disturbing, Dr. Lanna discovered that numerous patients had cancers that were not being treated.

(d)     Dr. Lanna detected a pattern in which patients would remain within the Steward system for months or years, coming in for yearly physicals, and getting billed for them but not receiving the usual and customary care associated with a physical exam. This resulted in patients

costing less in the short term, but this is because the treatment of evident health problems was nonexistent or inadequate. When a problem worsened to the point at which Steward no longer wanted to care for patients (presumably either because the disease was too advanced for them to successfully treat it or too expensive), to avoid negatively impacting its quality metrics Steward referred the patients to hospitals outside of its network, such as Massachusetts General Hospital or Brigham and Women's Hospital in Boston.

(e)     Dr. Lanna witnessed Steward providers tell patients they were doing great when their lab results showed clearly that they were at risk of heart attack and stroke if not managed properly. Instead of encouraging patients to get their vaccines, patients were often simply asked if they wanted a flu shot, and if they said no, providers quickly checked the box that the patient refused. This was true for all vaccinations. There were no efforts made to encourage patients to accept the vaccine with appropriate education.

(f)     Some patients had abnormal thyroid levels for years that Steward providers did not bother to recheck.

### 6.     Steward routinely falsified clinical data in patients' files, thereby causing the submission of false claims for payment

128.    Dr. Lanna observed that Steward physicians were directed to alter blood pressure readings to be consistent with the parameters set internally by Steward and integrated into ACO metrics. Dr. Lanna witnessed instances in which providers falsely recorded patients' blood pressure in order to place it within the healthy range. Likewise, blood pressures were checked with very inexpensive stethoscopes and automated machines, known to be far more accurate, were missing. Patients with high blood pressure were repeatedly and falsely diagnosed as having "white coat hypertension" meaning they only had high blood pressure when in the doctor's office. In reality no one performed due diligence to make sure that the diagnosis was correct. In

fact, these patients were likely to be suffering cumulative damage from diabetes, hypertension, and high cholesterol, as was predictable from their age, family history, and obesity, yet none of these illnesses were being managed. Steward regularly used substandard equipment in measuring blood pressures, knowing full well that this would prevent the diagnosis of hypertension from accurately being made. If they did not make the diagnosis, they did not have to spend the money treating the patient. Less money spent made them falsely appear efficient to CMS. It also increased their profits in the ACO patients, for whom they were getting paid $130 per member per month. If they did not diagnose them, they did not have to spend money treating them.

129.    Likewise, sometimes physicians with diabetic patients did not conduct hemoglobin A1c tests (which would show average blood sugar level for the past two to three months) in order to avoid flagging a problem with the patients' blood sugar.

130.    On a regular basis, at least weekly, nurses referred to as "chart reviewers" reviewed Steward's patients' medical charts and directed providers to up-code entries in patients' charts to reflect services for which payors, including the government health care programs, pay a higher reimbursement amount.

131.    Furthermore, the ancillary staff would recommend Steward home care and a variety of outpatient Steward services to patients without the invitation, request, or the written consent of the admitting physician.

132.    Dr. Zappala observed that physicians were routinely instructed by Steward health personnel to switch patients from observation status to inpatient status in order to increase the reimbursement amount.

133.    Likewise, Dr. Zappala observed that Steward urged physicians to add medical issues, such as pain, dehydration, or a variety of unusual constitutional symptoms to patients' charts,

even when the treating physicians did not believe it was warranted, in order to increase the reimbursement amounts.

### 7.   Steward reported inaccurate data to CMS to obtain inflated Shared Savings Program payments

134.   For each ACO, CMS and MassHealth have utilized: (1) data that Steward submitted directly and expressly as part of the ACO performance assessment process; (2) claims data Steward submitted; and (3) patient satisfaction information from beneficiaries within their respective ACO to calculate their ACO performance metrics scores and, ultimately, the periodic payment amount to which each ACO was entitled. Because Defendants have so corrupted the reliability and integrity of such data (by virtue of the unlawful conduct described herein), Steward's ACO performance metrics scores were and continue to be falsely inflated as are the ultimate payment amounts to which each ACO has been entitled.

### 8.   Steward's ACOs did not satisfy the statutory and regulatory prerequisites; Steward's misrepresentation of this material fact caused the submission of false claims

135.   Steward's ACOs are the cornerstone of its business model and are showcased on the Steward website and elsewhere to potential beneficiaries. However, these ACOs, as described above, are in truth engaged in unlawful fraudulent acts, violating ACO requirements in many respects, do not qualify for continued participation as an ACO, and would have been terminated by CMS and MassHealth had they been made aware of this fact. Defendants' failure to adhere to ACO guidelines, and their other unlawful activity, are material facts that have been concealed from CMS and MassHealth and which give rise to Defendants' submission of false claims for payment.

# VI.  COUNTS

## Count I
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(A)

136.    This is a claim for treble damages and civil penalties against Defendants under the

Federal FCA, 31 U.S.C. § 3729(a)(1)(A), for knowingly presenting, or causing to be presented,

false or fraudulent claims for payment or approval to the United States and/or, pursuant to 31

U.S.C. § 3729(b)(2)(A)(ii), to MassHealth.

137.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if

fully set forth herein and further allege as follows:

138.    Defendants have violated 31 U.S.C. § 3729(a)(1)(A) by engaging in the following

fraudulent schemes, among others, that are alleged herein:

(a)     knowingly presenting or causing to be presented false or fraudulent claims to the

government health care programs for payment for health care services and/or items that were:

- the result of Steward's illegal referral policies;

- the result of Steward's practice of depriving patients the right to receive
  services from the provider of their choice;

- referrals resulting from and induced by compensation arrangements that
  violate the Stark Statute, Federal AKS, and/or Massachusetts AKS; and

- grossly below accepted medical standards rendering such services essentially
  worthless.

(b)     knowingly presenting or causing to be presented false or fraudulent claims to the

government health care programs for payment for medically unreasonable and unnecessary and

improperly prescribed narcotics;

(c)     knowingly presenting or causing to be presented claims to the government health care programs for services at inpatient payment status when in fact the correct payment status was outpatient;

(d)     knowingly presenting or causing to be presented claims to the government health care programs for services that had been up-coded or made to appear more complex than they truly were;

(e)     knowingly presenting or causing to be presented claims to the government health care programs for artificially inflated bonus or shared savings payments that were based upon false quality of care data; and

(f)     knowingly presenting or causing to be presented claims to the government health care programs in which Steward falsely certified compliance with the prerequisites for participation in the Medicare and MassHealth ACO programs and conditions of payment under the ACO programs.

139.    Defendants also violated 31 U.S.C. § 3729(a)(1)(A) because as part of the alleged fraudulent schemes, Defendants knowingly caused false or fraudulent claims to be presented to MassHealth for reimbursement for health care services and items furnished to beneficiaries of MassHealth. Defendants thereby also caused MassHealth to submit false claims to the United States for reimbursement of Medicaid expenditures in violation of 31 U.S.C. § 3729(a)(1)(A). Defendants likewise violated 31 U.S.C. § 3729(a)(1)(A) because through these acts they knowingly presented or caused to be presented, under 31 U.S.C. § 3729(b)(2)(A)(ii), false or fraudulent claims to MassHealth (a grantee and/or recipient of United States funds) for reimbursement for services and items furnished to MassHealth beneficiaries.

44

140.    The United States, unaware of the foregoing circumstances and conduct, and in reliance

on the truth and accuracy of the claims for payment, paid or authorized payment of those claims

and has been damaged in an amount to be proven at trial.

**Count II**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

141.    This is a claim for treble damages and civil penalties against Defendants under the

Federal FCA, 31 U.S.C. § 3729(a)(1)(B), for knowingly making, using, or causing to be made or

used, a false record or statement material to false or fraudulent claims paid or approved by the

United States and/or, pursuant to 31 U.S.C. § 3729(b)(2)(A)(ii), to MassHealth.

142.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if

fully set forth herein and further allege as follows:

143.    Defendants have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or

causing to be made or used, false records or statements material to claims for reimbursement

paid by the government health care programs for, among other things, health care services and

items that were the result of Steward's illegal referral policies; health care services and items that

were referrals resulting from and induced by compensation arrangements that violate the Stark

Statute, Federal AKS, and/or Massachusetts AKS; health care services that were grossly below

accepted medical standards rendering such services essentially worthless; unnecessary and

improperly prescribed narcotics; and artificially inflated bonus or shared savings payments,

including, but not limited to:

  (a)    false patient referrals;

  (b)    false patient notes, orders, and prescriptions;

  (c)    false annual cost reports; and

  (d)    false quality of care reports.

45

144.    Defendants also violated 31 U.S.C. § 3729(a)(1)(B) because as part of the alleged fraudulent schemes Defendants knowingly made, used, or caused to be made or used, a false record or statement material to false or fraudulent claims paid or approved by MassHealth. Defendants thereby also caused MassHealth to make or use false records or statements material to false or fraudulent claims paid by the United States for reimbursement of Medicaid expenditures in violation of 31 U.S.C. § 3729(a)(1)(B). Defendants likewise violated 31 U.S.C. § 3729(a)(1)(B) because through these acts they knowingly presented or caused to be presented, under 31 U.S.C. § 3729(b)(2)(A)(ii), false or fraudulent claims to MassHealth (a grantee and/or recipient of United States funds) for reimbursement for services and items furnished to MassHealth beneficiaries.

145.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count III**
**Federal False Claims Act Violations**
**31 U.S.C. § 3729(a)(1)(C)**

146.    This is a claim for treble damages and civil penalties against Defendants under the Federal FCA, 31 U.S.C. § 3729(a)(1)(C), for conspiring to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), & (G).

147.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if fully set forth herein and further allege as follows:

148.    In violation of 31 U.S.C. § 3729(a)(l)(C), Defendants conspired with each other to commit the alleged violations of 31 U.S.C. §§ 3729(a)(l)(A), (B), and (G).

149.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count IV**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

150.    This is a claim for treble damages and civil penalties against Defendants under the Federal FCA, 31 U.S.C. § 3729(a)(1)(G), for knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States and states.

151.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if fully set forth herein and further allege as follows:

152.    Defendants knowingly made, used, and caused to be made and used, false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the government. Defendants were aware of their obligation under 31 U.S.C. § 3729(a)(1)(G) to repay to the government health care programs the payments that they received as result of the fraudulent schemes alleged herein.

**Count V**
**Massachusetts False Claims Act**
**Mass. Laws. ch. 12, § 5B(a)(1)**

153.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if fully set forth herein and further allege as follows:

154.    By virtue of the acts described above, Defendants "[k]nowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" in violation of Mass. Laws. ch. 12, § 5B(a)(1).

155.    The Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' acts and conduct alleged herein.

156.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### Count VI
### Massachusetts False Claims Act
### Mass. Laws. ch. 12, § 5B(a)(2)

157.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if fully set forth herein and further allege as follows:

158.    By virtue of the acts described above, Defendants "[k]nowingly ma[de], use[d] or cause[d] to be made or used a false record or statement material to a false or fraudulent claim" in violation of Mass. Laws. ch. 12, § 5B(a)(2).

159.    The Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' acts and conduct alleged herein.

160.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**Count VII**
**Massachusetts False Claims Act**
**Mass. Laws. ch. 12, § 5B(a)(3)**

161.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if fully set forth herein and further allege as follows:

162.    By virtue of the acts described above, Defendants "conspire[d] to commit a violation of [Mass. Laws. ch. 12, §§ 5B(a)(1), (2), or (9)]" in violation of Mass. Laws. ch. 12, § 5B(a)(3).

163.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**Count VIII**
**Massachusetts False Claims Act**
**Mass. Laws. ch. 12, § 5B(a)(4)**

164.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if fully set forth herein and further allege as follows:

165.    By virtue of the acts described above, Defendants "knowingly present[ed], or cause[d] to be presented, a claim that-includes items or services resulting from a violation of [the Federal AKS or Massachusetts AKS]" in violation of Mass. Laws. ch. 12, § 5B(a)(4).

166.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**Count IX**
**Massachusetts False Claims Act**
**Mass. Laws. ch. 12, § 5B(a)(10)**

167.    Relators reallege and incorporate each allegation in each of the preceding paragraphs as if fully set forth herein and further allege as follows:

168.    By virtue of the acts described above, Defendants are "beneficiar[ies] of ... inadvertent submission[s] of a false claim[s] to the commonwealth or a political subdivision thereof, or [are]

49

... beneficiar[ies] of ... overpayment[s] from the commonwealth or a political subdivision

thereof, and who subsequently discover[ed] the falsity of the claim[s] or the receipt of

overpayment[s] and fail[ed] to disclose the false claim[s] or receipt of overpayment[s] to the

commonwealth or a political subdivision by the later of: (i) the date which is 60 days after the

date on which the false claim or receipt of overpayment was identified; or (ii) the date any

corresponding cost report is due" in violation of Mass. Laws. ch. 12, § 5B(a)(10).

169.    The Commonwealth of Massachusetts, unaware of the falsity of the records, statements

and claims made, used, presented or caused to be made, used or presented by Defendants, paid

and continues to pay the claims that would not be paid but for Defendants' acts and conduct

alleged herein.

170.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged,

and continues to be damaged, in a substantial amount to be determined at trial.

171.    Pursuant to Mass. Laws. ch. 12, § 5B(a), the Commonwealth of Massachusetts is entitled

to three times the amount of actual damages plus a penalty of $5,500 to $21,563 per violation.

### PRAYER FOR RELIEF

WHEREFORE, Relators demand that judgment be entered in favor of the United States

and the Commonwealth of Massachusetts and against Steward and Cerberus for the maximum

amount of damages and such other relief as the Court may deem appropriate on each Count. This

includes, with respect to the Federal FCA, three times the amount of damages to the United

States plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim

submitted on or before November 2, 2015, and civil penalties of no more than $21,916 and no

less than $10,957 for each false claim submitted between November 3, 2015 and January

29,2018, and civil penalties of $11,181 to $22,363 for penalties assessed after January 29, 2018,

and any other recoveries or relief provided for under the Federal FCA. This request also includes, with respect to the Massachusetts FCA, the maximum damages, the maximum fines or penalties, and any other recoveries or relief provided for or permitted by those state statutes.

Further, Relators request that they receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States and the Commonwealth of Massachusetts, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relators request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

DATED:  October 10, 2018                      Respectfully submitted,

                                              ARROWOOD LLP

                                              By: _____

                                              Lisa G. Arrowood (BBO No. 022330)
                                              Sarah E. A. Sousa (BBO No. 691089)
                                              10 Post Office Square
                                              7th Floor South
                                              Boston, MA 02109
                                              (617) 849-6200

                                              COHEN MILSTEIN SELLERS & TOLL PLLC
                                              Jeanne A. Markey
                                              Gary L. Azorsky
                                              Casey M. Preston
                                              1717 Arch Street, Suite 3610
                                              Philadelphia, PA 19103
                                              (267) 479-5700

                                              *Counsel for the Relators*

51

## CERTIFICATE OF SERVICE

I hereby certify that I will cause a copy of the above Complaint to be served on the following counsel by certified mail, return receipt requested:

The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

The Honorable Andrew E. Lelling
Acting United States Attorney
District of Massachusetts
John Joseph Moakley
United States Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

The Honorable Maura Healey
Attorney General of Massachusetts
Attorney General's Office
One Ashburton Place
Boston, MA 02108-1518

DATED:  October 10, 2018

Lisa G. Arrowood