# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, and THE COMMONWEALTH OF MASSACHUSETTS *ex rel.* STEPHEN M. ZAPPALA, OLIVIA LANNA, and ERIC WOJCIK, | ) ) ) ) ) ) | No. 1:18-cv-12125-RGS |
| Plaintiffs, | ) | |
| v. | ) ) | |
| STEWARD HEALTH CARE SYSTEM, LLC, *et al.,* | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANT STEWARD HEALTH CARE SYSTEM LLC'S OPPOSITION TO RELATORS' PETITION FOR ATTORNEYS' FEES, COSTS AND EXPENSES PURSUANT TO 31 U.S.C. § 3730(d)(1) AND THE PARTIES' SETTLEMENT AGREEMENT

Defendant Steward Health Care System LLC and its related entities (collectively, "Steward") oppose the petition for attorneys' fees, costs, and expenses filed by relators Stephen Zappala, Olivia Lanna, and Eric Wojcik ("Relators"). As discussed more fully below, Steward does not dispute that Relators are entitled to receive a portion of their attorneys' fees and costs arising from the settlement of this action under the fee-shifting provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(d)(1). It is Relators' burden, however, to establish the reasonableness of their fees in this case where the government conducted the investigation, intervened in only one of the eight claims alleged in Relators' 51-page complaint, and negotiated, with Relators' assent, a $4.7 million settlement with Steward. Even that $4.7 million settlement overstates Relators' contributions to the matter as that settlement payment resolved one claim the Relators' identified to the government as well as two other unrelated issues that Steward self-disclosed during the course of the investigation. Under these circumstances, Relators cannot carry the burden of

1

proving that the more than $1.2 million in fees they now seek, incurred by two different law firms, for their work on the entirety of the case is reasonable.

As the First Circuit has very recently held in *United States ex rel. Lovell v. AthenaHealth, Inc.*, 56 F.4th 152 (1st Cir. 2022), Relators are only entitled to attorneys' fees for work performed on claims for which the Relators received a share of the settlement proceeds (the "relator's share"). In other words, under *Athena,* Relators can recoup fees for work on the claim that was settled—and for which they received a settlement payment—but they are *not* entitled to the entire $1.2 million in fees they claim for work on eight distinct claims, only one of which was settled. Relators' Ex. A, Settlement Agreement at Recitals E – G (the "Covered Conduct"). Relators' attempts to distinguish *Athena* are unavailing, as they misleadingly revise the holding and then re-write their complaint to argue that their eight claims are "intertwined." But the First Circuit's holding in *Athena* was clear, and Relators are entitled to fees incurred only in connection with the one settled claim.

Indeed, as *Athena* confirms, attorneys' fees are not awarded under the FCA as a matter of right. Quite the opposite—FCA relators and their counsel are only entitled to "reasonable" fees *if* a settlement or judgment is obtained in connection with a specific successful claim. There is necessarily an element of risk that they will recover none of their fees if no settlement or judgment is obtained or will recover only a portion of them where, as here, payment was made to settle only one of many claims. This construct is not only clear from the FCA itself, and further clarified by *Athena*, but it is sound policy. If FCA relators were entitled to all their fees even after only one claim was settled, relators would be incentivized to engage in unnecessary and wasteful work, "throwing claims at the wall," that would unnecessarily increase fees. Such an incentive directly undermines the goal of the FCA, which is to encourage relators to identify meritorious claims to

the government so that the government is alerted to potential abuses and yet does not waste resources sifting through meritless claims included because relators had no incentive to maximize efficiency and present only those claims on which they were likely to prevail.

It is clear from the submissions in this case that Realtors engaged in substantial work wholly unrelated to the one successful claim and also have failed to establish the reasonableness of their fee claim in other ways.  Among other things, they continue to seek fees based on vague billing entries and for time, including non-productive travel time, that is not recoverable as a matter of law.  As also set forth below, Relators were represented by two law firms in this matter and one of those firms in particular submitted bills that are wildly bloated (more than double the bills submitted by the Boston firm).  Lastly, Relators failed to submit declarations cited in their petition, while also suggesting that Steward should pay for a wholly redundant and unnecessary purported "expert" declaration on fees.  None of these fees are reasonable.

Any award of fees and costs to Relators should not exceed $150,000, or one eighth of the fees and costs currently submitted.  This is the only portion of their fee claim that could possibly be related to the claim in which the government intervened and is otherwise reasonable.

## BACKGROUND

### I.    Relators' Claims

On October 10, 2018, Relators filed a sealed *qui tam* complaint (the "Action") against Steward.  ECF No. 1 ("Complaint").  Two law firms, Arrowood LLP ("Arrowood") and Cohen Milstein Sellers & Toll PLLC ("CMST") jointly represented the Relators and participated in filing the Action.

Relators brought eight distinct claims pursuant to which they alleged that Steward violated the FCA in a variety of different ways.  Specifically, Relators alleged that:

- "Steward forces patients . . . to receive their care from providers within Steward's ACO network . . . [t]o fraudulently inflate profits and improve its ACO's metrics" (Compl. ¶¶ 104 – 15) ("Claim 1");

- "Steward induced referrals to providers within its ACO network in violation of the Federal AKS, Stark Statute, and Massachusetts AKS, thereby causing the submission of false and fraudulent claims" (*id.* ¶¶ 116 – 21) ("Claim 2");

- "Steward prohibits physicians from exercising their best medical judgment for their patients and has undermined the doctor-patient relationship" (*id.* ¶ 122) ("Claim 3");

- "Steward providers routinely over prescribe narcotics and other controlled substances to patients" (*id.* ¶¶ 123 – 26) ("Claim 4");

- "Steward engaged in a pervasive pattern of failure to provide adequate patient care" (*id.* ¶ 127) ("Claim 5");

- "Steward routinely falsified clinical data in patients' files" (*id.* ¶¶ 128 – 33) ("Claim 6");

- Steward "reported inaccurate data to CMS to obtain inflated Shared Savings Program payments" (*id.* ¶ 134) ("Claim 7"); and

- "Steward's ACOs did not satisfy the statutory and regulatory prerequisites (*id.* ¶ 135) ("Claim 8")."

Relators list each of these claims separately in the Complaint, with each claim containing varying degrees of detail.  For example, Relators' most detailed claim is their first: they devote no fewer than six pages of the Complaint to allegations regarding a purported scheme by Steward's Accountable Care Organization ("ACO") to "inflate profits and improve its ACO metrics."  *Id.* at 29 – 34.  In support of this claim, Relators assert that Steward stopped approving Dr. Zappala's referrals outside the Steward network.  *Id.* ¶¶ 109 – 13.  Another two pages and 6 paragraphs of the Complaint are dedicated to Claim 6, that Steward "falsified clinical data," alleging that Drs. Lanna and Zappala witnessed Steward physicians altering blood pressure readings and adding medical issues to patients' charts in order increase federal healthcare payments to Steward.  *Id.* ¶¶ 128 – 33.

As even a cursory review of the Complaint makes clear, each of the eight claims are

distinct, with each supported by an entirely different set of facts and relying on different legal theories as to why each purported scenario violates the FCA.  For example, in Claim 4, Relators alleged that Steward pressured Dr. Lanna, a primary care physician practicing at the Steward facility at Crown Colony in Quincy, Massachusetts, to overprescribe narcotics to her patients.  *Id.* ¶¶ 123 – 26.  According to the Complaint, the excess prescribing was a stand-alone violation of the FCA.  *Id.*  In contrast, as part of Claim 2, the only claim that was settled, Relators alleged that Steward leased medical office space to Dr. Vartan Yeghizarians, a physician associated with Holy Family Hospital, in exchange for Dr. Yeghiazarians' agreement to exclusively refer patients to Steward facilities.  *Id.* ¶ 120.  The purported legal significance of this allegation is that Steward violated the Stark Law and the Anti-Kickback Statute ("AKS") by offering Dr. Yeghiazarians remuneration (space at a medical facility) in exchange for referrals.  *Id.*

## II.    The Government's Investigation

On January 9, 2019, the U.S. Attorneys' Office for the District of Massachusetts ("USAO") issued a subpoena *duces tecum* to Steward (the "Subpoena").  *See* Affidavit of Sarah E. Walters, ¶ 3.  The Subpoena sought documents associated with only three of Relators' claims: those involving whether Steward prohibited physicians from exercising their best medical judgment (Compl.  ¶ 122) (Claim 3); whether providers routinely overprescribed narcotics (*id.* ¶¶ 123 – 26) (Claim 4); and whether Steward violated the FCA by inducing referrals in violation of the Federal AKS, Stark Law, and Massachusetts AKS (*id.* ¶¶ 116 – 21) (Claim 2).  *See* Walters Aff. ¶ 3.  To Steward's knowledge, the other five claims in the Complaint were never even *investigated* by the government.  *See id.*  ¶¶ 3 – 4.

After issuing the Subpoena, the USAO, worked in conjunction with the Attorney General's Office for the Commonwealth of Massachusetts (collectively, the "Government") to further

investigate the claim related to the improper inducement of referrals (Claim 2).  *Id.* ¶ 4.  Within this broad claim, Relators articulated, and the Government investigated, two more specific allegations.  First, as noted above, Relators alleged that Steward leased real property and medical equipment to potential referral sources, namely Dr. Vartan Yeghiazarians and physicians associated with Essex Orthopedics.  Compl. ¶¶ 120 – 21.  Although the Government inquired about Steward's relationship with Dr. Yeghiazarians, it did not actively engage with Steward about that issue.  Walters Aff. ¶ 4.

Second, Relators alleged that Steward provided referral sources with "sham call coverage contracts."  Relators alleged that Steward's Good Samaritan Medical Center ("GSMC") paid a urology practice to establish a Prostate Cancer Center of Excellence at GSMC but the center was never created.  Compl. ¶¶ 117 – 19.  This, Relators alleged, amounted to an illegal kickback in violation of the AKS.  *Id.*  The Government investigated this claim thoroughly over the course of four years.  Among other things, the Government sought documents, asked questions and substantively engaged with Steward on the Prostate Cancer Center of Excellence issue.  Walters Aff. ¶ 4.  Importantly, however, the Government never even inquired of Steward about the ACO allegations and, beyond the initial Subpoena, did not seek additional information regarding any of Relators' other allegations.  *Id.*

### III.    Settlement and Demand for Attorneys' Fees

On April 25, 2022, Steward, the Government, and Relators settled the entirety of the Action, with Relators receiving a portion of the $4,735,779.04 settlement payment and both the Government and the Relators agreeing to dismiss the Action, in its entirety, with prejudice. Settlement Agreement at Terms and Conditions 2, 3 and 19.  Relators received $724,935.47 from the United States as their "Federal Relators' Share" and $79,146.96 from the Commonwealth of

Massachusetts as their "Commonwealth Relators' Share." *Id.* at Terms and Conditions 2 and 3. The only remaining issue to be litigated following the settlement is the reasonableness of payment of attorneys' fees due to the Relators. *Id.* at Recital K. In the Settlement Agreement, Steward explicitly "reserve[d] the right to contest Relators' claims for expenses, attorneys' fees and costs on any and all available grounds." *Id.*

The Covered Conduct set forth in the Settlement Agreement, and the only conduct for which Steward received a full release from the Government or the Relators, addresses only one allegation within one claim raised in the Complaint: the allegation, within Claim 2, regarding the Prostate Cancer Center of Excellence. *Id.* at Recital G. As part of the Settlement Agreement, Steward also resolved two issues that it self-disclosed during the Government's four-year investigation. First, that Steward failed to charge proper rent on some real property it leased to physicians, physician organizations, and non-physician organizations, which may have violated the AKS and/or the Stark Law. *Id.* at Recital E. Second, Steward disclosed that it paid Dr. Bahige Asaker for an administrative role at GSMC but was unable to verify that he performed his required duties. *Id.* at Recital F. Neither of these issues were identified in Relators' Complaint and yet both factored heavily into the ultimate settlement payment of $4.7 million. Thus, the more than $800,000 that Relators already received—or 15% of the *total* settlement proceeds—is already a windfall as they received the benefit of a payment made to the Government in connection with two issues that they did not even bring to the Government.

And yet Relators still seek more than $1.2 million in attorneys' fees. Relators' fee demand represents approximately one and a half times *more* than, or 150% of, the payment the Relators received as their relator's share of the total settlement proceeds. *See id.* at Terms and Conditions 2 and 3. Specifically, Relators seek attorneys' fees for work performed by two law firms, 11

attorneys, and four non-attorney staff.[1]  According to their billing records, Arrowood appears to have worked on the matter for three months before CMST joined the team, and yet CMST's fees are more than double that of Arrowood's.  *Compare* CMST's fee demand of approximately $895,000 *with* Arrowood's fee demand of approximately $398,000.[2]

## ARGUMENT

Relators are not entitled to the more than $1.2 million fees that they seek.  First, and most importantly, Relators' demand includes fees for all of the time their attorneys spent on the *entirety of the case*, despite their so clearly having received settlement proceeds in connection with only one of their eight claims.  Second, Relators' billing records are in many instances insufficient to support *any* claim for fees and Relators seek fees for time that, as a matter of law, are not "reasonable" and are not recoverable.

### I.      Relators Are Not Entitled to Attorneys' Fees for Work Performed on Unsuccessful Claims

When the government proceeds with an FCA action brought by a relator, the relator is entitled to a portion of the settlement proceeds known as "the relator's share."  31 U.S.C. § 3730(d)(1).  The relator that receives those proceeds is entitled to "reasonable expenses which the court finds to have been necessarily incurred plus reasonable attorneys' fees and costs."  31 U.S.C. § 3730(d)(1).

Last December, in *Athena*, the First Circuit joined courts throughout the country[3] in holding that relators are entitled to "reasonable" attorneys' fees incurred only in connection with

---

[1] As discussed below, Relators now seek attorneys' fees for work performed by an additional law firm and attorney for work on the declaration of Suzanne Durrell.

[2] In his declaration, Gary Azorsky claims that Relators' counsel are jointly claiming 16,615.7 hours of "merits time" on the case.  Azorsky Decl. ¶ 25.  Steward assumes this is a typo, as, even with bloated time entries, Relators' counsel could not possibly have spent that much time on this case.  And such a figure is not even close to supported by the time records Relators submitted.

[3] *See, e.g., United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 786 F. Supp. 2d 110, 118 (D.D.C. 2011) ("[N]o compensation should be paid for time spent litigating claims upon which the party seeking the fee did not

claims that were settled.  56 F.4th at 162.  Specifically, the First Circuit examined Section 3730(d)(1) and identified the two statutory pre-requisites for the receipt of fees: "First, the relator must have brought an 'action' in which the government intervenes.  Second, the relator must receive a payment of 'at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim.'"  *Id.* at 158 (citations omitted).  As relevant here, the *Athena* court further determined that the term "action" in the statute does not refer to "a case as a whole," but to "individual claims" and thus the entitlement to fees is also claim specific.  *Id.* at 159.  Specifically, the First Circuit concluded that a relator is only entitled to reasonable attorneys' fees expended pursuing individual claims on which the Government has intervened and settled; not those claims brought in the *qui tam* complaint that the Government declined to pursue and for which no payment was made.  *Id.* at 155 ("We affirm . . ., rejecting [relator's] argument under the text of 31 U.S.C. § 3730(d)(1) that he may be allowed fees associated with his claim in which the government did not intervene.").  The First Circuit thus affirmed the district court's award of only half of relator's claimed fees, as only one of the relator's two claims were settled.  In connection with the $18.25 million settlement in *Athena*, the relator in that matter ultimately received $433,000 in attorneys' fees, or less than 10% of the total proceeds the relator received from the settlement.[4]

*Athena* is of course directly applicable here.  Only one portion of one claim brought by Relators was settled, specifically that portion of Claim 2 (improper inducement of referrals) related to a Prostate Cancer Center of Excellence.  That is the only allegation, and the only claim brought by Relators, for which the Government received payment and for which the Relators in this Action

---

ultimately prevail." (citations omitted)); *United States ex rel. Zediker v. OrthoGeorgia*, 407 F. Supp. 3d 1330, 1349–50 (M.D. Ga. 2019) (holding that a relator is not considered to have prevailed on a claim in which the government did not intervene and for which no money was recovered); *United States ex rel. Chiba v. Guntersville Breathables, Inc.*, 421 F. Supp. 3d 1241, 1264 (N.D. Ala. 2019) (noting that the relators correctly "excised [] hours from their fee request to reflect the dismissal of [] non-intervened, non-settled claims").

[4] Unlike in this case, the relator's share in *Athena* was not publicized.  Under Section 3730(d)(1), Relator was entitled to 15 to 25 percent of the total settlement amount, or between $2.7 and $4.5 million.

received a relator's share of the proceeds.  And yet the majority of the work reflected in Relators'
billing records is wholly unrelated to the settled claim.

For example, it is clear from Relators' counsel's time entries that Relators are seeking
compensation for at least 181 hours of time their attorneys spent pursuing claims based on Dr.
Lanna's unsuccessful allegations (Claims 4, 5, and 6) amounting to more than $136,000 in fees
alone.  *See* Walters Aff., Ex. A.  Relators' counsel also billed more than 143 hours ($97,096) on
the claims regarding Steward's alleged ACO scheme, and an astounding 203 hours ($189,600)
investigating whether private equity company and former Steward investor Cerberus Capital
Management ("Cerberus") could be held liable in this action.  *Id.*  Cerberus was not even a party
to the Settlement Agreement.  At the end of the day, the only issue that Relators brought to the
Government, and was actually settled, is a discrete one arising out of Relators' assertions related
to a Prostate Cancer Center of Excellence at one of Steward's Massachusetts hospitals.  Relators
are not entitled to attorneys' fees for work on these other, unsuccessful, claims.  *See Athena*, 56
F.4th at 161.

Relators of course recognize that their claim for the entirety of their fees is barred by *Athena*
and thus attempt to re-write both the First Circuit's decision and their Complaint in support of their
false assertion that *Athena* actually "*expands* a defendant's liability to pay fees, costs, and expenses
for attorney work on declined claims."  Relator's Petition at p. 10 (emphasis added).  As the plain
language of the *Athena* decision makes clear, the First Circuit has expressly limited defendants'
liability for fees to only those fees incurred in connection with a settled claim.  No common sense
reading of *Athena* suggests that it has somehow "expanded" defendants' obligations to pay fees
incurred in connection with claims that were declined and for which no settlement payment was
made.  The First Circuit explicitly rejected that argument.

In a last-ditch effort to avoid the consequences of the *Athena* decision on their claim for the entirety of their fees, Relators attempt to re-write their Complaint, arguing that the intervened and declined claims are so interrelated as to be indistinguishable from each other and suggest that the seven declined claims were somehow useful and necessary to the settlement of the one claim. To be clear, the First Circuit in *Athena* did *not* suggest that Relators are entitled to fees if the declined and dismissed claims were somehow interrelated or necessary to the overall settlement. To the contrary, the First Circuit determined that the district court's findings that the claims in *Athena* were not interrelated was not an abuse of discretion and suggested that, because the declined claim was likely more complex than the successful one, the district court was arguably generous in reducing the *Athena* relator's fees by only 50%. *See* 56 F.4th at 161.

But even if interrelatedness was somehow an exception to the rule established in *Athena*, which it is not, the Complaint drafted and filed by the Relators here demonstrates that their eight separate claims—separated by different headings and supported by entirely distinct factual allegations and legal theories—are *not* interrelated. Indeed, the government did not even *investigate* most of them (Walters Aff. ¶ 4), so they could not have been "useful" or "necessary" to the ultimate settlement of the single claim. Again, the *only* claim that was identified in the Complaint and was settled, and which even contributed to a settlement payment for which Relators received a share, relates to payments Steward made to Brockton Urology for a Prostate Cancer Center of Excellence. Compl. ¶¶ 117 – 19. This claim, attributed to information supplied by only one of the three Relators, Eric Wojcik, makes no reference to, for example, alleged pressure imposed on Steward physicians to keep patients within the ACO network (Claim 1), nor does it relate to overprescribing opioids (Claim 4), fraudulently inflating profits and manipulating ACO metrics (Claim 7), or failing to provide adequate patient care (Claim 5). Relators now suggest

that—notwithstanding their actual Complaint—their allegations regarding pressure to keep referrals within the ACO network was somehow the backdrop for all of their claims.  *See* Relators' Memorandum of Law ("MOL") at 12 – 13.  But the Complaint they drafted belies that assertion. Moreover, alleged pressure to keep referrals in-network, on its face, has no relevance to their allegations regarding the Prostate Cancer Center of Excellence, in which Relators simply alleged that Brockton Urology was paid for non-existent services.  Nor do their allegations regarding pressure within the ACO relate to their other unsuccessful claims, like overprescribing opioids or manipulating ACO metrics.

Finally, faced with no actual factual overlap, Relators bizarrely argue that the Prostate Cancer Center of Excellence claim "require[d] significantly more intricate and complex facts, and more legal research" than the seven declined claims.  MOL at 11 – 12.  It appears that Relators think that if they establish that their work on the one settled claim was "complex" that they are somehow entitled to the entirety of their fees.  But that is of course not the law.  Rather, under *Athena*, they are entitled to their fees for work in support of the one settled claim.  It is thus Relators' burden to provide *evidence* of what fees they incurred in connection with that claim. They have not done that—indeed, the time records submitted by their counsel *do not make a single reference* to Brockton Urology or the Prostate Cancer Center of Excellence and include only a handful of references to discussions between members of the Arrowood team and Wojcik regarding his allegations.  There is no evidence that CMST attorneys even spoke to Wojcik, much less investigated his claim regarding Brockton Urology.  Relators' time entries thus reveal that, in stark contrast to their current suggestion about the complicated nature of the one settled claim, they spent significantly *less* time developing that claim than the others.

Relators' claim of complexity is further belied by both their Complaint and common sense. The factual allegations in support of the settled claim were included in three paragraphs of the 171-paragraph Complaint.  Likewise, common sense dictates, and the Complaint confirms, that alleging that physicians were paid for services they did not perform is neither factually nor legally more complex than meeting the fraud pleading standard to support claims that Steward manipulated data to benefit its ACO or that Steward compromised patient safety.  Notwithstanding their assertions to the contrary, Relators clearly dedicated substantially more time to the claims that were dismissed than to the one that were settled and for which they received a relator's share.[5]

In sum, consistent with *Athena*, the Relators are entitled to fees associated only with the settled claim and their time entries demonstrate little work on that claim.  While arguably that suggests that they are entitled to virtually no fees, Steward agrees that an alternative method of calculating their fees is to award them a percentage of their fees based on the number of claims in the Complaint and the number of claims that were settled—as the district court did in *Athena*. Here, as set forth above, Relators brought eight distinct claims and settled, and received a relator's share, of one.  As a result, they are entitled to no more than one eighth of their total fees, or $150,000.

---

[5] In another desperate attempt to distinguish *Athena*, Relators seem to suggest that they are also entitled to fees under Section 3730(d)(2), which provides for the payment of the relator's reasonable fees when the government declines a claim and a relator pursues, and receives an award (either by way of settlement of judgment), in connection with that claim.  Relators cling to that Section because the First Circuit's opinion in *Athena* was focused on Section 3730(d)(1).  As an initial matter, Relators are prevented from pursuing fees under Section 3730(d)(2) because they released Steward from any potential liability under that Section.  *See* Settlement Agreement at Terms and Conditions 7 and 19 (releasing Steward from any and all liability except under "31 U.S.C. § 3730(d)(1) and/or its state analogs").  Even if Relators had retained the ability to pursue fees under that Section, Section 3730(d)(2) is obviously inapplicable here because the government did intervene and the Relators dismissed their remaining non-intervened claims.  Even if Section 3730(d)(2) did apply—which it does not—that Section includes the same wording as that used in Section 3730(d)(1), that the Relator must receive proceeds of "the action" or "the settlement of the claim."  The First Circuit's analysis of Section 3730(d)(1) thus applies with equal force—specifically, that entitlement to fees is claim specific.

## II.     Relators Have Not Met Their Burden of Establishing the Reasonableness of Their Fees as Required by the FCA

Relators bear the burden of establishing the reasonableness of both the work performed and the rate charged.  *U.S. ex rel. Averback v. Pastor Med. Assocs. P.C.*, 224 F. Supp. 2d 342, 350 (D. Mass. 2002).  They cannot do that here because, in addition to seeking fees for work on the seven unsuccessful claims, Relators seek attorneys' fees that are not appropriately supported by the billing records.

As a preliminary matter, it is unclear from Relators' filings what precise amount of fees they are seeking.  It appears Relators are seeking approximately $1.2 million in fees, plus some undisclosed amount for work over the past two months.  Azorsky Decl. ¶ 49.  That said, CMST actually asks this Court for three different amounts:  Relators' Memorandum of Law and proposed order seek $830,005.50 in fees for CMST (MOL at 14; Proposed Order); Relators' Motion seeks $895,874.69 in fees for CMST's work (Relators' Petition at 3); and Relators' time records indicate that CMST charged $1,156,208.75 in fees (sum of attorneys' time in Relators' Exhibit B).  The Court cannot award the Relators *any* fees on this current record.

Even if Relators' time records and various requests were coherent, they still cannot carry their burden of establishing reasonableness.  First, they continue to seek fees based on vague entries that reflect excessive, redundant, unnecessary, and/or unsupported work, as well as fees associated with non-productive travel time, all of which is—as a matter of law—not recoverable.  Second, as is clear not only from their overall fee demand, but also when reviewed in closer detail, CMST's fees are wildly bloated.  Finally, Relators' fee demand includes fees for the preparation of declarations that were never filed and an unnecessary "expert" declaration and fees associated with those declarations should be excluded from any award.

### i. The Billing Records Submitted by Relators Do Not Satisfy the Requirements of the FCA

Relators continue to seek fees that are unrecoverable, as a matter of law. First, many of the descriptions in the billing records provided by Relators are vague and leave no way to evaluate the reasonableness of time spent on certain tasks. For example, Jeanne Markey and Casey Preston of CMST block billed over 153 hours in 1 – 8.25 hour increments for drafting portions of the Complaint with entries as vague as "draft complaint" and "revise complaint." Markey's time entries are particularly vague.[6] Recognizing these deficiencies, Relators vaguely claim that "'[b]lock billing' time has also been reduced" (MOL at 16), but they do not specify how this time was reduced or by how much. Relators have not met their burden of providing adequate documentation for multiple entries and the fees associated with those entries are therefore unrecoverable. *See, e.g., United States ex rel. Raggio v. Seaboard Marine, Ltd.* No. 1:10-CV-01908-BJR, 2017 WL 2591288, at \*7 (D.D.C. May 4, 2017) (reducing total hours spent by an additional 20% due to block billing); *Belcon Enterprises, Inc.*, 2016 WL 7494855, at \*2–8 (reducing fees owed to a relator based on excessive billing for the drafting of the Complaint, teleconferences concerning "case status," vague time entries, duplicated time entries for a single set of tasks); *Thompson v. Quorum Health Resources, LLC*, No. 1:06-CV-168, 2010 WL 2044542, at \*3 (W.D. Ky. 2010) (determining that a 25% reduction in attorney's fees was warranted where documentation was insufficient to determine whether the hours billed were "duplicative or excessive").

Second, CMST billed at least 22.75 hours of non-productive travel time, amounting to $24,223.75 in fees. While CMST claims to have "reduced its travel time by one half" (MOL at

---

[6] *See, e.g.*, J. Markey time entries: Mar. 14, 2019 ("new information from Wojcik to remember"); Apr. 7, 2020 ("How private equity makes us sicker"); May 18, 2020 ("CEPR article by Eileen Appelbaum"); Nov. 10, 2020 ("impact of PE acquisition on hospitals"); Sept. 16, 2021 ("new factual information").

16), this reduction was not universally applied to all travel time entries.  *Compare* Sept. 18, 2018 G. Azorsky time entry for 3.25 hours for "half time of Travel to and from Boston" *to* Dec. 4, 2018 G. Azorsky time entry for 3.5 hours for "travel to Boston" *and* Dec. 6, 2018 G. Azorsky time entry for 3 hours for "travel from Boston."   Regardless, fees—discounted or otherwise—for unproductive travel are not recoverable.  *See Customs Fraud Investigations, LLC v. Victaulic Co.*, No. 13-2983, 2019 WL 4280494, at *8 (E.D. Pa. 2019); *U.S. ex rel. Poulton v. Anesthesia Assocs. Of Burlington, Inc.*, 87 F. Supp. 2d, 351, 357–58 (D. Vt. 2000).

Relators' counsel here is doing *exactly* what the FCA is intended to prevent.  They are seeking a windfall of *all* of their fees, not their *reasonable* fees associated with the one meritorious claim that they identified for the Government.

### ii.   CMST's Time Entries are Bloated

Even after its supposed reductions, CMST continues to seek more than double the fees sought by Arrowood for overlapping work.  CMST's bloated fees are the result of their improper billing in at least two ways:  1) billing in .25 increments; and 2) billing for excessive amounts of time and having senior lawyers dedicating huge amounts of time to matters that should have been handled by more junior attorneys.

As an initial matter, instead of billing in the industry-standard 0.1-hour increments, CMST billed in 0.25-hour increments, which significantly increases the time they reportedly spent on tasks.  In this Circuit, this billing practice alone requires that Relators' demand for CMST's fees be reduced by 25%.  In *Perez-Sosa v. Garland*, 22 F.4th 312 (1st Cir. 2022), the First Circuit held that billing in 15-minute increments instead of six-minute increments necessarily overstated the amount of time actually spent on the matter and upheld the district court's 25% reduction of the total fees.  *Id.* at 331.  Recognizing their flawed billing structure—which is especially shocking

given that CMST holds themselves out as experienced relators' counsel—Relators now claim that CMST billed in quarter hour increments between July 2018 and November 2022, or for the four years in which they performed the bulk of their work up through the actual settlement of this matter, and that all of CMST's "time before December 2022 that was billed in quarter-hour increments has been reduced by 25%."  MOL at 16.  But it is impossible, based on the actual *evidence* submitted, for Steward or the Court to confirm whether or how this reduction has been applied.  The time entries that Relators have submitted still show that their time prior to November 2022 was recorded in .25 hour increments.  *See* Relators' Ex. B.  Nothing Relators submitted suggests that this time has been reduced in a methodical or accurate way.

CMST's time entries also are demonstrably bloated because when CMST and Arrowood performed the same tasks, CMST billed substantially more time than Arrowood.  For example, on March 27, 2020, Lisa Arrowood billed one hour for calls with Azorsky and the government, Sarah Sousa of the Arrowood firm billed 0.7 hours for apparently the same calls, and Azorsky of CMST billed four hours for the same calls, plus "emails to and from DOJ."  Realtors' Ex. B.  CMST's use of .25 billing increments—regardless of any supposed after the fact reduction—also necessarily inflates its bills as the firm appears to always round up, artificially increasing the amount of time spent on any given task.  For example, on August 17, 2018, Lisa Arrowood billed 1.6 hours for a conference call with Azorsky, Markey, Sousa, and Oliva Lanna and a follow-up call with Azorsky.  Azorsky billed 1.75 hours for the same calls.  Then, in a clear discrepancy, Sousa billed 1.2 hours for the conference call portion, while Markey billed 1.75 hours for the exact same call.  These discrepancies are rampant throughout CMST's bills, as are other obviously inflated entries.  *See, e.g.*, Oct. 11, 2018 J. Markey time entry (billing one hour to read an eight-page article); June 16, 2020 J. Markey time entries (billing 9.25 hours to reading articles,

correspondence with the government, and identifying an expert witness).  Additionally, Azorsky block billed several days of meetings that are not only redundant, but obviously bloated.  *E.g., compare* Aug. 14, 2018 bill of G. Azorsky for meetings (9.5 hours) *with* Aug. 14, 2018 bill of L. Arrowood for the same meetings (7.7 hours).  CMST cannot recover for such inflated time entries.

Lastly, CMST had its most experienced lawyers billing significant amounts of time to tasks that should have been handled by much more junior, and less expensive attorneys.  For example, Jeanne Markey, an attorney with 40 years of experience and billing at $1,075 per hour billed an exorbitant amount of time simply on research, reading publications, reviewing materials, and performing administrative tasks.  Ms. Markey billed at over $1,000 per hour to: schedule meetings (*e.g.*, Sept. 7, 2021 time entry); and read articles generally about private equity in healthcare.  In total, Ms. Markey appears to have spent more than 40 hours and billed $43,806.25 for reading publications, most of which related to whether Cerberus could be held liable in this matter.  Walters Aff., Ex. A.  As noted, Ms. Markey's extensive reading did not produce results for the Relators or the Government, as Cerberus is not a party to the Settlement Agreement.  Similarly, Regina Poserina, an attorney with 31 years of experience and billing at $950 per hour, only began working on the case in earnest *following* the settlement.  From the April 2022 settlement until June 29, 2023, Ms. Poserina *alone* billed over 222 hours and $211,000 to negotiating a settlement on attorneys' fees.  Walters Aff., Ex. A.  And Ms. Poserina was only one of four CMST attorneys to bill time to these post-settlement negotiations.  *See* Relators' Ex. B.

Again, Relators are only entitled to their "reasonable" fees, not all of them, and CMST's fees are demonstrably unreasonable.

     **iii.**    **Relators' Have Not Filed Declarations Necessary to Support Their Fee Claim, While Also Filing—and Suggesting that Steward Should Have to Pay For—Other Unnecessary "Expert" Declaration**

Finally, Relators purport to rely on declarations that have not actually been filed as well as an "expert" declaration to allegedly justify their rates, which declaration is wholly unnecessary.

Relators claim to have filed attorney declarations as Exhibits B-1 through B-4, on behalf of attorneys Gary L. Azorsky (Ex. B-1), Jeanne M. Markey (Ex. B-2), Lisa G. Arrowood (Ex. B-3) and Regina D. Poserina (Ex. B-4).  *See* Petition ¶ 9.  The only declaration actually submitted, however, was that of Azorsky, which was filed as Exhibit B-1.  The Court should disregard statements supported only by the un-filed declarations.  Moreover, while Steward agrees that Relators are entitled to a portion of the fees incurred in connection with the filing of this Petition (specifically, one eighth of their fees, equal to the portion to which they are entitled for their work on this matter), fees associated with declarations that were not even filed should be eliminated from any fee award.

Similarly, fees associated with an unnecessary and redundant purported "expert" declaration, which declaration *was* filed, should also be eliminated from any award.  Relators submit the declaration of Suzanne E. Durrell, an experienced relator's counsel in FCA cases, which is essentially an expert report on the reasonableness of Relators' counsels' fees.  Durrell's declaration simply recites her CV and lists supporting caselaw with associated attorney billable rates.  But Relators' counsel themselves are experienced FCA lawyers, are familiar with the "going rates" for relators' counsel and the Arrowood firm is particularly familiar with rates in Boston.  Relators' counsel necessarily prepared their own declaration and, as Ms. Durrell has done in her own FCA matters, could have simply added the information supplied by Ms. Durrell into their

own declaration.[7]   The Durrell declaration is superfluous.   The costs associated with the preparation of the Durrell declaration should also be deducted from any award given that it was wasteful and unnecessary for Relators' counsel to seek it out in the first place.[8]

## CONCLUSION

For the reasons set forth above, Relators' motion for more than $1.2 million in attorneys' fees, costs, and expenses (plus additional fees not yet incurred in connection with further briefing of his fee petition and the "expert" declaration) should be denied.  Relators should recover no more than one eighth of their fees in light of the settlement of only one of their eighth of their claims. Accordingly, this Court should award Relators no more than $150,000 in fees, costs, and expenses based on what has been submitted to date and should scrutinize additional submissions, awarding—at most—one eighth of the fees, costs and expenses associated with the preparation and filing of the fee petition.

Date: September 20, 2023                    Respectfully submitted,

                                            /s/ Sarah E. Walters
                                            Mark W. Pearlstein (BBO #542064)
                                            Sarah E. Walters (BBO #638378)
                                            MCDERMOTT WILL & EMERY LLP
                                            200 Clarendon Street, Floor 58
                                            Boston, Massachusetts 02116
                                            Tel: (617) 535-4000
                                            mpearlstein@mwe.com
                                            sewalters@mwe.com

                                            *Counsel for Steward Healthcare System LLC*

---

[7] Ms. Durrell's declaration is as odd as it is unnecessary.  While Ms. Durrell mentions that counsel for Steward was also counsel in the *Athena* fee litigation, Ms. Durrell omits that she served as counsel for a second-to-file relator in *Athena* and although she aggressively pursued fees, she was denied them in their entirety.

[8] Indeed, as is clear form this Opposition, and as experienced Relators' counsel could no doubt have anticipated, Steward is not challenging the reasonableness of the rates charged.  If Steward had challenged the rates, the Relators of course could have addressed that issue in their reply, which they have already been authorized to file pursuant to the briefing schedule.  For the reasons set forth above, the Durrell declaration is unnecessary even if Steward had challenged the rates because it says nothing that could not have been included in the declaration already filed by Relators' counsel, but it would have been more reasonable to seek further evidence to support the reasonableness of the rates until after Relators reviewed Steward's arguments in opposition.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2023, I electronically filed the foregoing document using the ECF filing system, which will send notice of the filing to counsel of record.


*/s/ Sarah E. Walters*
Sarah E. Walters